**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

MARC EXTER JERNIGAN,

                        Petitioner,

v.

MERRIAN EDWARD,

                  Respondent.

Case No.:  15cv2793 BTM (RBB)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE DENYING PETITION FOR WRIT OF HABEAS CORPUS [ECF NO. 1]; ORDER DENYING REQUEST FOR EVIDENTIARY HEARING [ECF NO. 28] AND DENYING MOTION FOR DISCOVERY [ECF NO. 30]**

      Petitioner Marc Exter Jernigan, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition") challenging his conviction in San Diego Superior Court case no. SCD258695 for murder. (ECF No. 1.)[1]  Jernigan raises numerous claims in the 1479-page Petition he filed in this Court.

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system, <u>except</u> <u>for</u> <u>lodgments</u>.

The Court has read and considered the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer ("Answer") [ECF No. 19], the Reply to the Respondent's Answer [ECF No. 26], the lodgments and other documents filed in this case, and the legal arguments presented by both parties. For the reasons discussed below, the Court **RECOMMENDS** that the Petition [ECF No. 1] be **DENIED**. The Court **DENIES** his request for an evidentiary hearing and for discovery [ECF Nos. 28, 30].

## I. FACTUAL BACKGROUND

The victim in this case is June George. In 1984, June lived in La Mesa with her daughter, Kathy, and Kathy's stepfather, Fred George. (Lodgment No. 7, <u>People v. Jernigan</u>, D060746, slip op. at 3 (Cal. Ct. App. Dec. 18, 2013).) Kathy began dating Petitioner while the two attended Helix High School. Within three months, the relationship became intense and they began a sexual relationship. (<u>Id.</u>) She and Jernigan talked about living together and getting married, and they opened a joint checking account. (<u>Id.</u> at 3-4.) Kathy was the only one working and depositing money into the account, however, and over time this became an issue in their relationship. (<u>Id.</u> at 4.) Jernigan also became controlling and possessive. (<u>Id.</u>) Kathy talked to her mother, June, about the problems in the relationship, and June told Kathy that she should break up with Petitioner. (<u>Id.</u>) Kathy told Jernigan about June's advice. (<u>Id.</u>)

About two weeks before June's murder, Kathy broke up with Petitioner and closed their joint checking account. (<u>Id.</u> at 4-5.) Before doing so, she told Jernigan that June was going to receive $1,500, which she did not plan on sharing with her husband Fred, but she did not tell him where June was going to store the money. (<u>Id.</u> at 4.) Petitioner was upset about the closing of the account and the breakup. (<u>Id.</u> at 5.)

On August 8, 1986, the day of the murder, Kathy arrived home at about 5:20 p.m. to find several relatives standing outside her home waiting for June. (<u>Id.</u>) June had planned to host a family reunion at her home that evening. (<u>Id.</u>) Kathy went into the house and found her mother's body on the floor of the kitchen. (<u>Id.</u>) June had been stabbed nearly eighty times and there were signs of a struggle. (<u>Id.</u>) Her purse was found

on the bedroom floor and its contents had been dumped out.  (Id. at 6.)  During June's autopsy, the tip of a knife was found imbedded in her skull.  (Id. at 5.)  Police later determined that a chef's knife with a broken tip, found in a kitchen drawer, was the murder weapon.  (Id.)  Police seized a blood-stained towel; a blood-stained bedspread; a purse and its contents, including a wallet and an eyeglass case; and a blood-stained tissue in the bathroom.  (Id.)  They also found a pink stain on the bathroom counter.  (Id.)

Jernigan was interviewed the night of the murder.  (Id.)  He told police he did not know of anyone who would want to kill June and that he did not have any ill feelings toward June, Kathy, or their family.  (Id.)  Police took Petitioner's fingerprints, and although La Mesa Police Officer Quinn testified at trial that he saw scratches on Petitioner's arms, he did not record that in his contemporaneous police report.  (Id.)

In 1994, approximately eight years later, police interviewed Jernigan again.  He told officers that on the day of the murder, he had planned to return a music tape to a friend who lived near Kathy and then stop by Kathy's house, but when he arrived, he saw the police tape and returned home.  (Id. at 7.)  Police had previously determined that the murder occurred sometime between 2:00 p.m. and 5:20 p.m.  (Id. at 5.)  Jernigan told police he was at the scene after 5:30 p.m., and when he got home, his mother told him the police wanted to talk to him, so he returned to the scene.  (Id. at 7.)

During the 1994 interview, Jernigan also told police that in 1986, Detective Burke interviewed him the day after the murder.  (Id.)  Jernigan told Burke he was doing laundry the afternoon of the murder and that there was another man from his apartment complex in the laundry room as well.  (Id. at 7-8.)  Petitioner told police that in 1994 Burke did not appear to be interested in locating the other man.  (Id. at 8.)

In an attempt to solve this case, Detective Brown, of the Metropolitan Task Force, sent evidence samples to the California Department of Justice (DOJ) for DNA testing.  (Id.)  Criminalist Colleen Spurgeon found the bedspread stains contained at least two individuals' DNA, and the major contributor to those stains matched Jernigan's DNA profile.  (Id. at 9.)  Spurgeon also found a Y chromosome present in one of the samples

from the bathroom stain, indicating DNA from at least one male was present.  (Lodgment No. 3, Rep.'s Tr. vol. 35, 7168-69, July 21, 2011.)  After receiving the test results, Brown interviewed Jernigan again.  (Lodgment No. 7, <u>People v. Jernigan</u>, D060746, slip op. at 8.)  He asked Jernigan whether there was any chance his blood would be found on June's wallet, bedspread, or in her bedroom, and Jernigan said "no."  (<u>Id.</u>)  Jernigan told Brown his fingerprints would probably be found all over June's house, however, because he had been in the home many times while he and Kathy were dating.  (<u>Id.</u>)  He also told Brown he and Kathy had sex in Kathy's room, the living room, and the den, but not in June's bedroom.  (<u>Id.</u>)

In late 2003 and early 2004, criminalist Connie Milton, from the San Diego County Sheriff's Office, performed more DNA testing on evidence from June George's murder.  (Lodgment No. 3, Rep.'s Tr. vol. 39, 7720, 7724, July 28, 2011.)  She tested a receipt, two business cards, a checkbook, and a red leather purse belonging to June.  (<u>Id.</u> at 7728-29.)  The only DNA results she obtained were from a stain on the purse which tested positive for the presence of blood.  (<u>Id.</u> at 7730-31.)  Milton obtained a partial DNA profile but could not identify anyone with it.  (<u>Id.</u> at 7731.)  Jernigan was excluded as the source, however.  (<u>Id.</u> at 7815.)

Milton tested more items in late 2005 and 2006.  (<u>Id.</u> at 7734.)  The bathroom stain tested positive for the presence of human blood, but Milton did not do any further testing on it.  (<u>Id.</u> at 7739.)  Instead, because a Y chromosome was present, she recommended the stain be retested using Y-STR DNA testing to obtain further results.  (<u>Id.</u> at 7739-40.)  One bedspread stain had a mixture of DNA with a major contributor and low-level minor contributor.  Jernigan was identified as the major contributor with a frequency of occurrence of one in 290 sextillion of the African-American population.[2]  (<u>Id.</u> at 7741-43.)  Milton also found DNA on a stain from the eyeglass case.  There was no mixture present, but Milton was able to obtain a low level partial DNA profile from the stain

_____

[2] Jernigan is African American.

which matched Jernigan at four allele locations.  (Id. at 7743-44.)  The estimated frequency of occurrence for three of those alleles was one in 130,000; the calculation of frequency was based on the fact that Jernigan has a rare allele at a particular locus, which was found on the eyeglass case.  (Id. at 7765-67.)

Milton also tested nine stains from the towel found in the bathroom.  (Id. at 7751.) She was able to identify only June's DNA in stains B, E, G, H, I, and F.  (Id. at 7753-61.) Stains A and D, however, were a mixture of at least two people, with the major contributor matching Jernigan's DNA.  The frequency of the match for stain A was one in 290 sextillion African-Americans and for stain D was one in 280 trillion African-Americans.  (Id. at 7762-63, 7765.)  Stain C was a single source of Petitioner's DNA with a frequency of one in 6.5 sextillion African-Americans.  (Id. at 7763, 7765.)

In 2007, Milton performed a third round of DNA testing on items of evidence.  On a plastic photo holder from June's wallet, Milton found a rare allele consistent with Jernigan's DNA profile.  (Id. at 7767-69.)  She tested a second stain on the bedspread and found a mixture of DNA from at least two people.  (Id. at 7770.)  The major contributor was Petitioner, at a frequency of one in 340 sextillion of the African-American population.  (Id.)  She also tested two stains on June's wallet; both contained a single source of DNA which matched Jernigan.  The frequency for stain A was one in 340 sextillion for the African-American population, and for stain B, it was one in 7.8 sextillion.  (Id. at 7774-76.)  Also in 2007, Amy Rogala, of the San Diego Police's Crime Laboratory, performed DNA testing on evidence in Jernigan's case.  In particular, she performed Y-STR DNA testing on the bathroom stain Milton had previously tested and recommended for Y-STR testing.  Rogala found June's DNA but also found a low level DNA profile from which June's husband and stepson were excluded but from which Petitioner was not.  (Lodgment No. 7, People v. Jernigan, No. D060746, slip op. at 9.)

The final round of DNA testing was completed in 2009.  (Lodgment No. 3, Rep.'s Tr. vol. 40, 8047, Aug. 1, 2011)  Byron Sonnenberg, a criminalist at the San Diego County Sheriff's Office, tested five new areas on the towel found in June's bathroom.

(Id. at 8047.)  During the first round of testing, stains one, two, and four contained a single source of DNA that matched June's profile.  (Id. at 8048.)  Stains three and five, however, contained a mixture of DNA.  The major contributor of DNA to the stains was June, and there was insufficient DNA to determine the minor contributor.  (Id. at 8051.)  Sonnenberg noted, however, that Petitioner has four rare alleles in his DNA profile.  (Id.)  Sonnenberg did a second round of testing and tested an additional twenty-eight stains.  Of those, twenty-seven stains contained DNA.  (Id. at 8053.)  In twenty-six of the twenty-seven stains, June was either the major contributor or the sole contributor of DNA.  (Id. at 8053-54.)  The remaining stain matched Jernigan's DNA profile at a frequency of one in 340 septillion for the African-American population due to the rarity of four of his alleles.  (Id. at 8056.)

At trial, Jernigan attacked the validity of the DNA testing, particularly the testing done by Milton.  During the test run Milton performed on the tissue, bedspread stains, and eyeglass case stain in 2005-2006, Milton obtained an "unexpected result."  (Lodgment No. 3, Rep.'s Tr. vol. 39, 7745.)  A control sample called a "reagent blank," which should have contained no DNA, instead tested positive for a low level partial DNA profile.  (Id. at 7748.)  In an attempt to locate the source of the partial DNA profile, Milton took one of the reagents she had used and performed DNA testing on it.  (Id. at 7749.)  She was able to obtain a full male DNA profile, indicating the reagent was contaminated.  (Id. at 7749-50.)  She compared the DNA profile to other lab workers as well as to male samples from other casework which were in the lab at the time she did the testing in June George's case.  (Id. at 7750.)  The DNA profile did not match any of the lab workers or evidence samples.  (Id.)  Milton testified that the unknown male DNA profile from the reagent blank did not affect the validity of her 2005-2006 testing because there was "no indication of that unknown male showing up in any of those evidence samples."  (Id.)  Defense counsel elicited information on cross examination showing Milton had six other "unexpected result" incidents while she worked as a criminalist at the Sheriff's office.  (Id. at 7842-49.)  Milton had also failed a proficiency test in 2010

when she inadvertently switched tubes of DNA.  (Id. at 7782.)  Following her failed test, she passed 10 additional proficiency tests.  (Id. at 7781.)  Milton testified she was confident she did not switch the DNA samples of June and Jernigan for two reasons.  First, one sample was male and one was female, and any sample switch would have been obvious due to the gender marker present in DNA.  (Id. at 7782.)  Second, her test results were consistent with Colleen Spurgeon's results.  (Id.)

Jernigan also presented evidence from his DNA expert, Marc Taylor.  Taylor testified generally about the reliability of DNA results when there are mixtures of DNA, and partial profiles are obtained.  (See Lodgment No. 3, Rep.'s Tr. vol. 43, 10443-66, Aug. 4, 2011.)  In addition, Taylor pointed out that Milton had not run the appropriate controls during several tests.  (Id. at 10430-31, 10490-91, 10492-93.)  Taylor admitted, however, that he did not disagree with the conclusions of Spurgeon, Milton, Rogala and Sonnenberg.  (Id. at 10509-12.)

## II.  PROCEDURAL BACKGROUND

On July 27, 2006, the San Diego County District Attorney's Office filed an information charging Marc Exter Jernigan with one count of murder.  (Lodgment No. 1, Clerk's Tr. vol. 1, 0004-05.)  Petitioner also was alleged to have personally used a deadly weapon during the murder, within the meaning of California Penal Code § 12022(b).  (Id.)  Following a jury trial, Jernigan was convicted of first degree murder.  (Lodgment No. 3, Rep.'s Tr. vol. 46, 11121, Aug. 10, 2011.)  The jury also found Petitioner had used a deadly weapon during the commission of the crime.  (Id. at 11121-22.)  Petitioner was sentenced to twenty-five years to life imprisonment plus one year.  (Lodgment No. 1, Clerk's Tr. vol. 9, 2254-55.)

Jernigan appealed his conviction and sentence.  (See Lodgment No. 5, Appellant's Opening Brief, People v. Jernigan, No. D060746 (Cal. Ct. App. Dec. 18, 2013).)  The appellate court upheld Jernigan's conviction and granted him relief on his sentencing

claim.[3]  (Lodgment No. 7, <u>People v. Jernigan</u>, No. D060746, slip op. at 2.)  Petitioner filed a petition for review with the California Supreme Court.  (<u>See</u> Lodgment No. 8, Petition for Review, <u>People v. Jernigan</u>, No. [S215964] (Cal. Jan. 21, 2014).)  The California Supreme Court summarily denied the petition for review.  (Lodgment No. 9, <u>People v. Jernigan</u>, No. S215964, order at 1 (Cal. Mar. 27, 2014).)

Jernigan filed a habeas corpus petition in the San Diego Superior Court.  (Lodgment No. 10, <u>Jernigan v. State of California</u>, No. EHC 1031 (Cal. Super. Ct. filed Feb. 24, 2015) (petition for writ of habeas corpus).)   It was denied on April 13, 2015.  (Lodgment No. 11, <u>In re Jernigan</u>, No. EHC 1031, order at 1 (Cal. Super. Ct. Apr. 13, 2015).)  Petitioner then filed a habeas corpus petition with the California Court of Appeal.  (Lodgment No. 12, <u>Jernigan v. State of California</u>, [No. D067991] (Cal. Ct. App. filed May 5, 2015) (petition for writ of habeas corpus at 1).)  The court of appeal denied the petition on June 4, 2015.  (Lodgment No. 13, <u>In re Jernigan</u>, No. D067991, slip op. at 1-2.)  Petitioner next filed a habeas corpus petition with the California Supreme Court; it was denied on November 10, 2015.  (Lodgment No. 14, <u>Jernigan v. State of California</u>, [No. S227932] (Cal. filed July 20, 2015) (petition for writ of habeas corpus at 1); Lodgment No. 15, [<u>In re Jernigan</u>], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).)

Jernigan constructively filed a habeas corpus petition in this Court on November 24, 2015 [ECF No. 1], and a "Notice of Request for Ruling on Petition for Writ of Habeas Corpus Relief" on May 26, 2016 [ECF No. 25].  Respondent filed an Answer on June 2, 2016 [ECF No. 19], and lodgments in support of the Answer on June 3, 2016 [ECF Nos. 20-22].  Jernigan filed a Traverse on June 27, 2016 [ECF No. 26].  On August 18, 2016, Petitioner filed a "Motion Requesting an Evidentiary Hearing" [ECF No. 28], and on September 22, 2016, he filed a "Motion Requesting Additional Discovery" [ECF No. 30].  On December 13, 2016, this Court issued an Order denying

_____

[3] The sentencing claim is not at issue in this Petition.

the Notice of Request for Ruling on Petition for Writ of Habeas Corpus Relief, explaining that the matter was fully briefed and a Report and Recommendation on the merits would be issued [ECF No. 33]. The Order also denied the Motion Requesting an Evidentiary Hearing and Motion Requesting Additional Discovery without prejudice, noting that the issues raised in those motions were more appropriately addressed in the Report and Recommendation [id.].

### III.  STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Woodford v. Garceau, 538 U.S. 202, 204 (2003) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C.A. § 2254(d) (West 2006); Early v. Packer, 537 U.S. 3, 7-8 (2002) (quoting 28 U.S.C.A. § 2254(d)). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to

the facts of a particular case. Id. (citing Williams, 529 U.S. at 407-08). The "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citations omitted). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C.A. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000), overruled on other grounds by Andrade, 538 U.S. at 75-76; accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court decision will not be "contrary to" clearly established federal law. Id. Clearly established federal law, for purposes of § 2254(d), means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 71-72 (citations omitted).

## IV. DISCUSSION

### A. Grounds for Relief

Jernigan raises fifty-four claims in the Petition he has filed in this Court. Jernigan has grouped his claims by "sections." For ease of analysis, the Court has grouped his claims by topic and addresses them as follows.

///

1          **1.  Scientific Fraud, Misconduct, Negligence, and Creation of False Evidence**

In what Petitioner describes as section one, grounds two through five and seven
[ECF No. 1, Attach. #1, 14-15]; section two, grounds nine through fourteen [id. at 17-18];
section three, grounds sixteen through twenty-three [id. at 19-20]; and section four,
grounds one, two, and six [ECF No. 1, Attach. #3, 113-60; id. Attach. #4, 1-174; id.
Attach. #5, 30-110], Petitioner alleges criminalist Connie Milton's DNA testing was
produced through scientific fraud, misconduct, and negligence, and that criminalist
Shelley Webster was incompetent and negligent in her review of Milton's work; he also
claims it was false.  In what Jernigan describes as section one, ground four [ECF No. 1,
Attach. #1, 15]; section two, ground fifteen [id. Attach. #1, 18]; section four, grounds
three through five [id. Attach. #3, 109-10]; section six, ground one [id. Attach. #6, 139];
and section seven, grounds one, two, four, five, and seven [id. Attach. #7, 33-34],
Jernigan alleges that Milton and criminalist Chuck Merritt created false evidence.
Respondent argues that the state court's resolution of these claims was neither contrary
to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer
12-15, ECF No. 19.)

The claims in sections one through six of Jernigan's Petition were raised in the
habeas corpus petitions he filed with the California Court of Appeal and the California
Supreme Court.  (Lodgment No. 12, Jernigan v. State of California [No. D067991]
(petition for writ of habeas corpus at 3-4 and attachments); Lodgment No. 14, Jernigan v.
State of California, [No. S227932] (petition for writ of habeas corpus at 3-4 and
attachments).)  The claims in Petitioner's section seven were asserted in the habeas
corpus petition he filed with the California Supreme Court.  (Lodgment No. 14, Jernigan
v. State of California, [No. S227932] (petition for writ of habeas corpus at 3-4 and
attachments).)  The Supreme Court summarily denied the claims in sections one through
six and section seven.  (Lodgment No. 15, [In re Jernigan], California Courts, Appellate
Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).)
As to those claims, this Court must therefore "look through" to the state appellate court's

15cv2793 BTM (RBB)

opinion denying the claims to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Ylst, 501 U.S. at 805-06; see also Williams, 529 U.S. at 412-13.  For the claims raised in section seven of his federal petition, and only in the habeas petition filed with the California Supreme Court, this Court conducts an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853 ("[Court] perform[s] an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable.")

        Petitioner's claims must be divided into two separate inquires.  First, whether Milton's DNA results were a product of fraud, misconduct, or negligence and should therefore not have been admitted at trial; and second, whether Milton's DNA results and Merritt's test results were intentionally fraudulent and therefore were "false evidence" which should not have been admitted at trial.  Each question is governed by different legal standards.

        a.  Scientific Fraud, Misconduct, and Negligence

        In section one, grounds two through five and seven; section two, grounds nine through fourteen; section three, grounds sixteen through twenty-three; and section four, grounds one, two, and six, Jernigan alleges that Milton's scientific errors, misconduct, fraud, and negligence rendered all of her DNA results unreliable and therefore they should not have been admitted at his trial.  (ECF No. 1, Attach. #1, 95-99, 100-11, 122-49, 184-99; id. Attach. #2, 1-7, 23-136, 149-59; id. Attach. #3, 1-107, 113-60; id. Attach. #4, 1-174; id. Attach. #5, 30-110.)  He points to a laundry list of irregularities in Milton's DNA testing as support for his claims:  (1) During Milton's 2005-2006 testing of the bedspread, tissue, and eyeglass case, she got an "unexpected result" when a blank control which should not have contained any DNA instead was contaminated by an unknown

source of DNA (section one, grounds two, three, five, and seven); (2) during Milton's 2005-06 DNA testing, she did not report results from one of the testing wells containing a standard DNA control sample, well B-3, which rendered her DNA tests invalid; (3) Milton did not follow established DNA lab protocol when she continued her DNA testing despite contamination or failure of well B-3; (4) she had two cancelled test runs on the 310 Genetic Analyzer during her 2005-06 DNA testing; (5) Milton did not follow established DNA lab protocol when she restarted those test runs without troubleshooting the cause of the cancelled runs; (6) uncorrected laser and capillary problems with the 310 Genetic Analyzer during the 2005-06 DNA testing rendered the DNA tests Milton performed in January and February of 2006 invalid and improperly excluded other suspects; (7) supervisors in the San Diego Sheriff's Crime Lab did not appropriately supervise and review her work and did not appropriately discipline Milton for her errors; (8) Milton did not disclose the cancelled runs or the capillary and laser problems with the 310 Genetic Analyzer to supervisors; (9) neither Milton nor the San Diego Sheriff's Crime Lab follow established lab protocols; and (10) the Crime Lab did not properly review or supervise Milton's work. (Id.)

Jernigan has submitted voluminous documents to support his claims, including Milton's DNA testing notes, worksheets, testing run printouts, raw DNA data, reports, memos, pages from various manuals that pertain to DNA lab protocol and DNA testing instruments, and transcripts of portions of testimony by Milton at trial and at a hearing on the motion to exclude evidence. (ECF No. 1, Attach. #1, 97-99, 102-11, 115-21, 124-49, 186-99; id. Attach. #2, 1-7, 27-52, 56-84, 88-92, 95-106, 109-28, 130-36, 153-73, 177-94, 199-202; id. Attach. #3, 1-5, 9-21, 24-65, 68-74, 78-91, 94-111, 115-85; id. Attach. #4, 1-153, 156-74; id. Attach. #5, 31-110.) Most of the documents provided by Jernigan are "bates stamped," indicating they were provided during discovery.

The state appellate court did not address Jernigan's scientific fraud, misconduct, and negligence claims directly, casting them solely in terms of claims of false evidence. (See Lodgment No. 13, In re Jernigan, No. D067991, slip op. at 1-2; Lodgment No. 15,

[In re Jernigan], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).) The San Diego Superior Court, however, concluded that Jernigan's claims based on "numerous instances of criminalist Milton's negligence, misconduct, violations of protocol and/or fraud" were "barred because they could have been, but were not, raised at trial or on appeal." (Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 3-4.) Although these claims may be barred by procedural default, "a habeas court may, in its discretion, reach the merits of a habeas claim . . . despite a State's waiver of the defense." Boyd v. Thompson, 147 F.2d 1124, 1127 (9th Cir. 1998); see also Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982) (deciding the merits rather than adjudicating procedural default).

Here, the Court will analyze the merits of Jernigan's claims alleging that criminalist Milton's actions constituted scientific fraud, misconduct, and negligence. Because there is no last reasoned state court opinion to which this Court can defer, the Court must conduct an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

The erroneous admission of evidence under state law is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67 (1991). To the extent Petitioner argues the state court's admission of Milton's DNA testing was contrary to state law, he is not, therefore, entitled to relief. In any event, Milton's DNA evidence was admissible under California law. Milton used polymerase chain reaction (PCR), short tandem repeat (STR), both the Profiler Plus and the Identifiler kits, and a 310 Genetic Analyzer in her testing. (Lodgment No. 3, Rep.'s Tr. vol. 30, 7732, July 28, 2011.) California employs the test enunciated in People v. Kelly, 17 Cal. 3d 24, 30, 549 P.2d 1240, 1244, 130 Cal.

Rptr. 144, 148 (1976), to determine the admissibility of new or novel scientific testing.[4] California courts have concluded that the results of PCR and STR DNA analysis, Profiler Plus and Identifiler kits, and from 310 Genetic Analyzers are admissible under the <u>Kelly</u> test. <u>People v. Morganti</u>, 43 Cal. App. 4th 643, 669, 50 Cal. Rptr. 2d 837, 853 (1996) (PCR analysis); <u>People v. Allen</u>, 72 Cal. App. 4th 1093, 1099-1100, 85 Cal. Rptr. 2d 655, 659-60 (1999) (PCR and STR testing); <u>People v. Hill</u>, 89 Cal. App. 4th 48, 58-59, 107 Cal. Rptr. 2d 110, 117-18 (2001) (same); <u>People v. Lazerus</u>, 238 Cal. App. 4th 734, 779, 190 Cal. Rptr. 3d 195, 233 (2015) (PCR-STR DNA analysis, Profiler Plus, and Identifiler kits); <u>People v. Smith</u>, 107 Cal. App. 4th 646, 671-72, 132 Cal. Rptr. 2d 230, 249-50 (2003) (DNA profiling involving mixed samples and the 310 Genetic Analyzer).[5]

Errors in testing go to the weight, not the admissibility of the evidence. "'[T]he <u>Kelly/Frye</u> rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony.' [Citation]." <u>People v. Cooper</u>, 53 Cal. 3d 771, 814, 281 Cal. Rptr. 90, 113, 809 P. 2d 865, 888 (1991) (alterations in original) (quoting <u>People v. Farmer</u>, 47 Cal. 3d 888, 913, 254 Cal. Rptr. 508, 765 P. 2d 940 (1989)). The same is true in the federal system. <u>See</u> <u>United States v. Hicks</u>, 103 F.3d 837, 846 (9th Cir. 1996), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>United States v. Grace</u>, 526 F.3d 499, 503 (9th Cir. 2008); <u>United States v. Goodrich</u>, 739 F.3d 1091, 1098 (8th Cir. 2014).

/ / /

---

[4] The California legislature abrogated <u>Kelly</u> with respect to polygraph tests in 1983 with the adoption of Evidence Code section 351.1, which excludes the admission of polygraph evidence in a criminal trial absent a stipulation by both parties. Cal. Evid. Code § 351.1(a) (West 2011).

[5] Prior to trial, defense counsel sought a <u>Kelly</u> hearing on the Y-STR testing done by Criminalist Colleen Spurgeon in Petitioner's case. (Lodgment No. 1, Clerk's Tr. vol. 8, 1816-18.) The prosecutor argued Y-STR testing had been accepted without a hearing in other states. (Lodgment No. 3, Rep.'s Tr. vol. 28, 6343-44, July 11, 2011.) The trial judge permitted the Y-STR to be admitted absent a hearing. (<u>Id.</u> at 6344.)

Jernigan contends the admission of Milton's DNA evidence nevertheless violated his due process rights. While the Supreme Court has made few rulings on the question of when the admission of evidence violates due process, the Ninth Circuit has noted that habeas relief is warranted "only when it results in the denial of a fundamentally fair trial in violation of the right to due process." Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (citing Estelle, 502 U.S. at 67-68); see also Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) (stating that the due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial so as to render the trial fundamentally unfair). "A writ of habeas corpus will be granted . . . only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000). "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

Admittedly, DNA contamination from an unknown source was detected in Milton's 2005-06 DNA tests of the tissue, bedspread, and towel. This did not, however, render her DNA testing "entirely unreliable" such that the jury would have been unable to "uncover, recognize, and take due account of its shortcomings." Mancuso, 292 F.3d at 956. Milton acknowledged on cross examination that a reagent which was not supposed to contain DNA instead tested positive for DNA. (Lodgment No. 3, Rep.'s Tr. vol. 39, 7745-46.) Nevertheless, Milton was able to obtain a full male profile from the unknown DNA and determined that it did not match any individuals in Jernigan's case, any of the male criminalists or lab technicians, nor any of the other male DNA samples that had recently been tested in the lab. (Id. at 7748-50, 7844-45.) While this was a breach in testing protocols, Milton testified that she determined the unknown male profile was not present in any of the evidence samples from Petitioner's case and it did not affect the

reliability of the tests or her conclusions about what the tests showed. (Id. at 7750.) In addition, she discussed the lab protocols she followed during her testing and the reports she made to supervisors following the unexpected result. Milton also acknowledged she had obtained unexpected results in other cases. (Id. at 7844-55, 7858.)

Jernigan contends Milton's failure to report the results from a testing well, well B-3 containing a standard DNA sample labeled "standard 8" used as a control, rendered her results unreliable. Jernigan's exhibits do not support his claim. The pages from the manual he provides state that "'[i]f the standard and amplification data meet the criteria listed above, the sample run can be accepted as valid.'" (ECF No. 1, Attach. #1, 37; id. at 35-43.) Well B-4 also contained a standard DNA sample labeled "standard 8," and Milton reported results from well B-4. (See ECF No. 1, Attach. #1, 47-52.) Jernigan has not established that a test failure of one of the wells containing standard 8, well B-3, would have rendered Milton's DNA testing unreliable in light of the fact that a second well, well B-4, which also contained standard 8, did produce results.

Jernigan also complains that Milton's test results were unreliable because of cancelled test runs, laser problems, and capillary failures which occurred during the DNA analysis Milton performed with the 310 Genetic Analyzer in 2005-06. Milton's 2005-06 testing revealed a mixture of DNA on June's bedspread with the major contributor being Jernigan, a partial single source DNA profile that matched Jernigan on the eyeglass case, two stains on the towel that were mixtures with Jernigan being the main contributor, and one stain on the towel that was a single source matching Jernigan. (Lodgment No. 3, Rep.'s Tr. vol. 39, 7741-44, 7751, 7761-64.) Petitioner has submitted pages from various manuals and official lab protocols for the San Diego County Sheriff's Department and contends that Milton's failure to stop the testing, determine the problem, and restart her testing after the cancelled test runs and capillary failures render her DNA results unreliable. But the documents he has provided do not state that DNA test results are unreliable and are not to be reported if test runs are cancelled, there are issues with the lasers, or capillaries fail. (ECF No. 1, Attach. #1, 97-99, 102-11, 115-21, 124-49, 186-

99; id. Attach. #2, 1-7, 27-52, 56-84, 88-92, 95-96, 109-28, 130-36, 153-73, 177-94, 199-202; id. Attach. #3, 1-5, 9-21, 24-65, 68-74, 78-91, 94-111, 115-85; id. Attach. #4, 1-153, 156-74; id. Attach. #5, 31-110.)  In addition, at a pretrial hearing on a motion to dismiss for the delay in charging Jernigan, Milton explained that a "failed run" of the DNA samples on the 310 Genetic Analyzer does not affect the evidence contained in the machine or compromise the results because the samples remained in their tubes. (Lodgment No. 1, Rep.'s Tr. 172-73, January 3 & 4, 2008).  Milton likened the process to identifying fingerprints in a computer database:  if a criminalist runs a fingerprint through a computer database and the computer crashes during the search, the fingerprint is not affected.  (Id. at 173.)  Moreover, Spurgeon also found Jernigan's DNA on June's bedspread; and Sonnenberg found Jernigan's DNA on the towel in a single source stain, bolstering the reliability of Milton's testing.  (Lodgment No. 3, Rep.'s Tr. vol. 35, 7175; id. vol. 40, 8055-56.)

Milton's failure to follow lab protocols and her performance on proficiency tests were explored at trial on cross examination; the jury was able to "uncover, recognize, and take due account" of any effect that failure to follow protocols had on test results.  See Mancuso, 292 F.3d at 956.  She testified she passed proficiency tests twice a year from 2000 until 2009.  (Lodgment No. 3, Rep.'s Tr. vol. 39, 7777-80.)  In 2010, three years after the last DNA testing she performed in Jernigan's case, Milton did not pass a proficiency test, which she attributed in part to the fact that she had stopped doing case work after her promotion to supervising criminalist in 2008.  (Id. at 7781.)  After the 2010 proficiency test, she took and passed ten additional proficiency tests.  (Id.)  She testified she could not have made the same mistake she made during the 2010 test – switching two reference samples – because in Jernigan's case, any switch in the DNA samples would have been immediately obvious given she was working with male (Petitioner's) and female (June's) DNA at the time.  (Id. at 7782.)  Moreover, Milton's testing in Petitioner's case ended in 2007, three years before the 2010 proficiency test.

///

1    Finally, Jernigan's DNA expert testified at length about the problems and

2    weaknesses he saw in the DNA testing, including the difficulty in identifying a DNA

3    profile from a stain containing either a partial DNA profile or a mixture of more than one

4    person's DNA, weaknesses in the population tables criminalists used to estimate the

5    frequency of a particular DNA profile, and contamination and breaches of testing

6    protocol that occurred during Milton's testing.  (Lodgment No. 3, Rep.'s Tr. vol. 43,

7    10439-505.)  In particular, he noted it was very difficult to identify a DNA profile from

8    the bedspread stains and the sink stain because they contained a mixture of DNA from at

9    least two individuals, (id. at 10443-44, 10450), the stain found on the eyeglass case was

10   of an extremely low quantity, (id. at 10691-92), and the lack of a control sample from the

11   eyeglass case meant there was no way to determine whether the DNA that was found

12   came from the blood in the stain or from the background, (id. at 10492-93).  He agreed,

13   however, that Jernigan could not be excluded as the source of DNA from the eyeglass

14   case stain.  (Id.)  And, on cross examination, Jernigan's expert admitted that he agreed

15   with all of the DNA testing in the case.  (Id. at 10511-12.)

16       There were problems with Milton's DNA testing.  Those weaknesses, however,

17   were thoroughly exposed and explored at Petitioner's trial.  Milton's DNA testing was

18   not "almost entirely unreliable," nor was it so flawed that "the factfinder and the

19   adversary system [was not] competent to uncover, recognize, and take due account of its

20   shortcomings."  Mancuso, 292 F.3d at 956.  This is not a situation where there were "no

21   permissible inferences the jury [could have drawn] from the evidence."  Jammal, 926

22   F.2d at 920.  Accordingly, the state court's denial of these claims was neither contrary to,

23   nor an unreasonable application of, clearly established Supreme Court law.  See 28

24   U.S.C.A. § 2254(d)(1).  Nor was it based on an unreasonable determination of the facts.

25   See id.(d)(2).  Jernigan is not entitled to relief as to his claims of scientific fraud,

26   misconduct, and negligence as stated in section one, grounds two through five and seven

27   / / /

28   / / /

[ECF No. 1, Attach. #1, 14-15]; section two, grounds nine through fourteen [id. at 17-18]; section three, grounds sixteen through twenty-three [id. at 19-20]; and section four, grounds one, two, and six [id. at 108-09].

### b. Admission of False Evidence

In what Petitioner labels as section one, ground four; section two, ground fifteen; section four, grounds three through five; section six, ground one; and section seven, grounds one, two, four, five, and seven, Jernigan contends false evidence was admitted at his trial.  (ECF No. 1, Attach. #1, 112-21; id. Attach. #2, 137-48; id. Attach. #4, 175-85; id. Attach. #5, 1-29; id. Attach. #6, 142-67; id. Attach. #7, 35-53, 66-75, 79-143; id. Attach. #8, 1-104.)  Specifically, he claims Milton falsified a memo she sent to her supervisors at the San Diego Sheriff's Crime lab regarding her DNA testing by failing to document the various errors she made.  (ECF No. 1, Attach. #1, 112-21; id. Attach. #2, 137-48.)  Jernigan also claims Milton falsified her 2006-07 DNA tests by failing to report results from the B-3 testing well.  (ECF No. 1, Attach. #4, 175-85; id. Attach. #5, 1-29.) Jernigan also contends District Attorney (D.A.) Investigator Howard and La Mesa Police Department Sergeant Vince Brown testified falsely that there was no evidence Petitioner had given a blood sample to police in 1986.  (ECF No. 1, Attach. #6, 142-67.)  Finally, Jernigan argues San Diego Sheriff Criminalist Chuck Merritt testified falsely that human blood was found under one of June George's fingernails and that he did not have a sample of Petitioner's blood during Merritt's 1986 testing.  The false testimony, according to Jernigan, invalidates both Merritt's blood testing and all the DNA testing that occurred after Merritt's testing.  (ECF No. 1, Attach. #7, 35-53, 66-75, 79-143; id. Attach. #8, 1-104.)  The state appellate court addressed Jernigan's false evidence claims as follows:

> It is not at all clear that false evidence was introduced at Jernigan's trial.  The alleged errors in the DNA testing procedures were known before trial and considered by experts retained by Jernigan.  It appears these experts concluded that although some of the DNA analysis was "sloppy," the end result was accurate.

/ / /

Even assuming that Jernigan's allegations of the falsity of evidence are true, however, he does not establish a reasonable probability of a different outcome in the absence of the allegedly false evidence. His challenges concern only the testing performed by one criminalist, Connie Milton. As discussed on direct appeal, three other scientists performed independent DNA analyses and also located Jernigan's DNA in the blood samples from the crime scene. Thus, even if Jernigan successfully discredits Milton's analysis, overwhelming evidence would still exist that Jernigan's blood was found at the crime scene.

(Lodgment No. 13, In re Jernigan, No. D067991, slip op. at 1-2.)

False evidence claims are governed by Napue v. Illinois, 360 U.S. 264 (1959). "A claim under Napue will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" Jackson v. Brown, 513 F.3d 1057, 1071-72 (9th Cir. 2008) (citation omitted). If there is "'any reasonable likelihood that the false testimony could have affected the judgment of the jury'" the conviction must be set aside. Id. at 1076 (quoting Hayes v. Brown, 399 F.3d 972, 985 (9th Cir. 2005).).

Jernigan's claims regarding Milton are not really false evidence claims. Rather, Petitioner essentially alleges the jury was not told certain information about Milton's testing. Specifically, Petitioner states the jury was not told that (1) in a memo she provided to her supervisors regarding the "unexpected result," i.e., unknown DNA found in a blank control, Milton had failed to include information about cancelled test runs during 2005-2006 testing, and (2) she either did not report any results from the standard human DNA contained in well B-3 of her December 20, 2005 test run or destroyed the results from that well. (See ECF No. 1, Attach. #1, 50-52.) As noted above in section IV(A)(1)(a) of this Report and Recommendation, any irregularities in Milton's testing went to the weight, not the admissibility of the DNA testing. The prosecution was not required to present evidence of cancelled test runs, memoranda that did not reflect the entirety of the testing process, or results from failed controls. That duty fell to defense counsel. The documents Jernigan presents to support this claim are bates stamped,

meaning the defense was in possession of this information prior to trial. (See Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 4 (stating that evidence of "Milton's negligence, misconduct, violations of protocol and/or fraud" was "turned over to the defense in discovery[]".) Whether defense counsel properly exercised his duty of representation by exposing the weaknesses in Milton's testing and testimony is addressed below in section IV(A)(3) of this Report and Recommendation.

In any event, Jernigan does not meet any of the three prongs of Napue with regard to Milton's testimony. First, Jernigan has not established that Milton's testimony at trial was false. Milton did not testify falsely about the memos she wrote to supervisors about the contamination. The exhibits Petitioner has provided regarding lab protocol or the procedures for performing DNA testing and interpreting DNA the results state that results are unreliable if a well containing a standard human DNA sample does not quantitate correctly. Milton did not testify she had no problems or errors during her DNA testing, did not deny there were cancelled test runs, and did not deny she did not report the results from well B-3.

Second, there is no evidence that the prosecution knew or should have known Milton's testimony was false. Indeed, the evidence is to the contrary. The prosecution disclosed evidence showing the cancelled test runs, unexpected results, and unreported data from well B-3, and it did not represent that Milton's testing was without error. (See ECF No. 1, Attach. #1, 47-52, 76-83, 98-99, 109, 116, 120, 126-27, 199; id. Attach. #2, 141, 182-92; id. Attach. #3, 2-5, 12-21.) Rather, Milton testified on both direct examination and cross examination about the "unexpected result" and indicated it did not affect the conclusions she arrived at in her report on the DNA results. (Lodgment No. 3, Rep.'s Tr. vol. 39, 7745-50, 7778-82, 7842-59.) Milton was also questioned about her training, her failure to pass a proficiency exam, and other instances in which she had experienced "unexpected results." (Id.)

Third, Petitioner has not established any alleged false testimony by Milton was material. Milton testified that the presence of the unknown DNA in the tube that was

supposed to contain no DNA did not affect her results because there was no evidence the unknown DNA had contaminated the evidence tubes. (Id. at 7748-50.) In addition, Jernigan's exhibits show Milton testified that cancelled runs do not affect the validity of DNA results. (ECF No. 1, Attach. #2, 50-51.) Jernigan's exhibits do not establish that cancelled runs invalidate DNA test results. Furthermore, defense counsel was in possession of the evidence establishing the unexpected result, the cancelled runs, and the missing well B-3 data. (Lodgment No. 3, Rep.'s Tr. vol. 43, 10438-40.)

Defense DNA expert Marc Taylor reviewed the testing materials before testifying. He testified about the various errors and problems with Milton's testing, but conceded in the end that the testing, though imperfect, and Milton's conclusions were accurate. (Id.) Moreover, well B-3 contained a standard DNA sample, labeled "standard 8," used as a control during testing. Well B-4 also contained a standard DNA sample labeled "standard 8," and Milton reported results from well B-4. (ECF No. 1, Attach. #1, 47-52.) Jernigan has not established that a test failure of well B-3, containing standard 8, affected the DNA testing and results from well B-4, which contained standard 8, and produced results that identified Jernigan's DNA at the murder scene. Finally, Milton's DNA evidence was not the only DNA evidence connecting Jernigan to the murder. Other criminalists placed Jernigan at the murder scene as well. Colleen Spurgeon found two mixed blood stains from the bedspread which matched Petitioner; Bryon Sonnenberg found one blood stain on the towel which matched Petitioner; and Amy Rogala concluded that Jernigan could not be excluded from a bathroom counter bloodstain. (Lodgment No. 3, Rep.'s Tr. vol. 35, 7175; id. vol. 40, 8055-56; id. vol. 33, 6817.)

Jernigan also claims D.A. Investigator Howard and La Mesa Police Sergeant Vince Brown both falsely testified at trial. Jernigan stated that after being interviewed briefly on August 8, 1986, the day of the murder, he went to the La Mesa Police Department the next day to give a blood sample. (Lodgment No. 3, Rep.'s Tr. vol. 42, 8346, Aug. 3, 2011). He could not remember the name of the individual who took his blood sample. (Id.) He also admitted on cross examination that he had not seen any documentation that

his blood sample was taken in 1986. (Id. at 8415-16.) Howard and Brown also testified they had not seen any documentation that Jernigan's blood had been taken by the La Mesa Police. (Lodgment No. 3, Rep.'s Tr. vol. 43, 10346; id. vol. 45, 10898-99.)

Jernigan has provided three exhibits he claims establish he provided police with a blood sample on August 8, 1986, the day of the murder. Exhibit E to section six, ground one, of his Petition is a County of San Diego Sheriff's Department Case and Item Listing. (ECF No. 1, Attach. #6, 160-63.) The first entry is titled "Vials Known Blood Sample: Marc Jernigan," and it lists the date seized as August 8, 1986, the day of the murder. (Id. at 162.) Exhibit F to section six, ground one, is a San Diego County Sheriff's Department Case, Item and Inquiry Report which also shows an item titled "Vials Known Blood Sample Marc Jernigan," and a date seized of August 8, 1986. (Id. at 164-65.) Exhibit G to section six, ground one, is a San Diego Sheriff's Department Case and Item Report that lists "Vials Known Blood Sample March Jernigan," and a seizure date of August 8, 1986. (Id. at 166-67.)

The evidence Jernigan has provided differs from his testimony at trial. The murder took place August 8, 1986. Jernigan testified he gave blood the following day, August 9, 1986. (Lodgment No. 3, Rep.'s Tr. vol. 42, 8346.) The documents Petitioner has provided show a seizure date for his blood vials of August 8, 1986, not August 9, 1986. Moreover, Exhibit E lists the same seizure date of August 8, 1986, for blood vials of June George, David George, and Kathy Keller. (ECF No. 1, Attach. # 6, 160-63.) Charles (Chuck) Merritt obtained June George's blood sample following her August 9, 1986 autopsy. (Lodgment No. 3, Rep.'s Tr. vol. 33, 6732; id. vol. 35, 7092.) La Mesa Police Officer Vince Brown testified he began working on the June George murder case in 2000, and as part of his investigation, he asked David George and Kathy Keller for blood samples; he received them on January 31, 2001. (Lodgment No. 3, Rep.'s Tr. vol. 37, 7308-11, July 25, 2011.) Keller confirmed this as well. (Lodgment No. 3, Rep.'s Tr. vol. 38, 7560, July 27, 2011.) Another portion of Howard's investigation was in February of 2005. (See Lodgment No. 3, Rep.'s Tr. vol. 45, 10806.) Thus, the "seizure date"

reflected in the San Diego County Sheriff's Department's documents does not correspond to the date the item was seized, at least with regard to the blood samples. Jernigan has not established Howard's and Brown's testimony was false. Jernigan has also not established his claim that Merritt falsely testified he didn't have Petitioner's blood at the time he performed his testing in 1986. (ECF No. 1, Attach. #7, 35-46.)

Jernigan has not demonstrated that the evidence, even if false, was material. He contends the testimony weakened his credibility before the jury. But the most damning evidence against Jernigan was the DNA evidence, and Petitioner has not shown what effect, if any, the existence of a blood sample from 1986 would have had on the jury's decision.

Jernigan next claims Merritt testified falsely about testing he performed on the fingernail scrapings from June George. (Id.) He contends Merritt's case notes show that he did not test all of the fingernail scrapings for blood, although Merritt testified that he had found human blood in all of them. (Id.) According to Jernigan, this calls into question all of Merritt's testimony and all of the subsequent DNA evidence based in part on Merritt's original conclusion that the fingernail scrapings, the bathroom stain, the bedspread stains, and the towel stains tested positive for the presence of human blood. (Id.) Even if Merritt's testimony about the fingernail scrapings was at odds with his notes, this does not establish that all of his testing and evidence were false. Moreover, the evidence was not false because Milton also tested the fingernail scrapings, a bathroom stain, bedspread stains, and towel stains, and they tested positive for the presence of human blood. (Id. at 138-43; Lodgment No. 3, Rep.'s Tr. vol. 39, 7735, 7739, 7753, 7767.) Nor was the fingernail scraping evidence material, because it did not implicate or exonerate Jernigan. No identifiable DNA was found in the fingernail scrapings other than June George's; she was the "major DNA profile." (Lodgment No. 3, Rep.'s Tr. vol. 39, 7735-36.)

Finally, although not entirely clear, Jernigan appears to suggest a broken seal on one of the envelopes containing Kathy Keller's blood sample means all of the DNA

testing cannot be trusted.  In support of this claim, Petitioner has attached a copy of a portion of transcript from the chain of custody hearing during which criminalist Spurgeon testified that when she prepared the blood for testing, she observed that a seal on an internal envelope containing Kathy Keller's blood sample was broken.  (ECF No. 1, Attach. #8, 67-76.)  Criminalist Spurgeon testified that when she received Keller's blood sample for testing, it came in a padded envelope.  Inside that envelope were two manila envelopes, one that contained nothing and a second that contained another manila envelope.  Inside the second manila envelope was a third envelope on which the seal was broken, and inside that envelope was Kathy Keller's blood sample.  (Lodgment No. 3, Rep.'s Tr. vol. 35, 7171-72, 7201.)  Spurgeon's notes indicate the blood sample was in a vial inside a plastic bag which had an intact evidence seal.  (ECF No. 1, Attach. #8, 70-71, 73.)  In an abundance of caution, after obtaining a DNA profile for Keller from the blood vial, Spurgeon was asked to run a second set of tests using an oral swab from Keller and obtained the same DNA profile.  (Lodgment No. 3, Rep.'s Tr. vol. 35, 7172.)  There is no evidence, therefore, the broken seal resulted in any false evidence being introduced at Petitioner's trial.

In sum, Jernigan has not established that the DNA evidence admitted at his trial violated his due process rights or that there was any false evidence admitted at his trial.  Petitioner's alleged evidentiary discrepancies were not material.  The Court finds that the state court decision on these claims was objectively reasonable.  Accordingly, the denial of those claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  See 28 U.S.C.A. § 2254(d)(1).  Nor was it based on an unreasonable determination of the facts.  See id.(d)(2).  He is not entitled to relief as to those claims.

## 2.  **Withholding Exculpatory Evidence and Prosecutorial Misconduct**

In section five, grounds one and two of his Petition, (ECF No. 1, Attach. #6, 13-14), Jernigan alleges the prosecutor withheld exculpatory evidence; and in section six, grounds two, three, and five, he alleges the prosecutor committed misconduct.  (Id. at

139-40.)  In section five, grounds one and two, Petitioner contends prosecutors did not disclose they possessed bloody root hairs obtained from June George's body, her clothing, and the body bag in which her body was transported, and tape lifts of trace evidence from the bedspread; Jernigan claims this evidence was exculpatory.  (Id. at 16-83.)  In section six, grounds two and three, Petitioner claims the prosecutor committed misconduct when she presented evidence that Jernigan did not give a blood sample to police in 1986.  (Id. at 168-200.)  In section six, ground five, Jernigan contends the prosecutor presented false testimony about the location of the serological samples in the case and that Fred George did not give a blood sample to police in the 1980's or 1990's.  (Id. at 205-21.)  Respondent argues the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer 19-20, ECF No. 19.)

> a.  Withholding Exculpatory Evidence

In section five, grounds one and two, Jernigan contends the prosecution withheld exculpatory evidence, specifically bloody root hairs found on June George's body and "trace evidence" from the bedspread.  (ECF No. 1, Attach. #6, 16-83.)  In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that a prosecutor must disclose all material evidence to the defendant.  In order to establish a Brady violation, Jernigan must prove three elements:  (1) the evidence was suppressed by the prosecution, either willfully or inadvertently, (2) the withheld evidence was either exculpatory or impeachment material, and (3) the evidence was material to the defense.  See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Benn v. Lambert, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing United States v. Bagley, 473 U.S. 667, 676, 678 (1985); United States v. Agurs, 427 U.S. 97, 110 (1976)).

In Strickler, the Supreme Court held that in addition to exculpatory or impeaching evidence they are actually aware of, prosecutors "'[have] a duty to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police.'"  527 U.S. at 281 (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)).

"Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial." Benn, 283 F.3d at 1053 (citing Bagley, 473 U.S. at 676; Agurs, 427 U.S. at 111-12). "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases." Id. (citing Bagley, 473 U.S. at 682; United States v. Shaffer, 789 F.2d 682, 688-89 (9th Cir. 1986)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.

Jernigan raised his Brady claims in the habeas corpus petition he filed in the California Supreme Court, which denied the petition without a citation of authority. (Lodgment No. 14, Jernigan v. State of California, [No. S227932] (petition for writ of habeas corpus [ECF No. 22, Attach. #27 at 95-154 to Attach. #28 at 1-13, 97-98]; Lodgment No. 15, [In re Jernigan], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited 5/31/17).) This Court must therefore "look through" to the last reasoned state court decision deciding these claims to determine whether their denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. See Ylst, 501 U.S. at 805-06. In denying the petition for habeas relief, the state appellate court analyzed Jernigan's Brady claims as follows:

> Jernigan also contends the prosecution withheld certain exculpatory evidence from the defense in violation of Brady v. Maryland (1963) 373 U.S. 83. To establish a Brady violation, Jernigan must show that the prosecution failed to disclose exculpatory evidence and that the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. (People v. Salazar (2005) 35 Cal.4th 1031, 1042-1043.) Jernigan makes no such showing. At most, he points to certain evidence collected by various law enforcement officers several decades ago that allegedly was not shown to his attorneys. He has no evidence that any of this evidence was exculpatory, i.e., favorable to Jernigan, or that, if it had been disclosed, there is a reasonable probability the jury would have reached a different

verdict. Jernigan's speculative claim that certain pieces of evidence <u>may have been</u> exculpatory is insufficient to state a prima facie case for relief.

(Lodgment No. 13, <u>In re Jernigan</u>, No. D067991, slip op. 2.)

The state appellate court correctly concluded Jernigan had not established the elements of a <u>Brady</u> claim. First, the evidence was not suppressed by the prosecution. Jernigan points to exhibits A and E of section five, ground one, to support his <u>Brady</u> claim. Exhibit A contains reports and notes indicating bloody root hairs and trace evidence were obtained from June George's clothing and the bags used to contain her body. (ECF No. 1, Attach. #6, 21-37.) Exhibit E is D.A. Investigator Howard's notes indicating he visited the Riverside Department of Justice in August of 2006 with District Attorney Andrea Freshwater. (<u>Id.</u> at 50-62.) Both of these exhibits, however, are Bates-stamped, indicating they were provided to the defense during discovery. (<u>Id.</u> at 21-62.)

Jernigan raised this claim in the habeas corpus petition he filed in the superior court. There, he alleged that he was not provided additional "bloody" items of physical evidence that prosecutors knew were exculpatory. (<u>See</u> <u>Jernigan v. State</u>, No. EHC 1031 (petition for writ of habeas corpus at 340-41 [ECF No. 22, Attach. #17, 73-74]).) The San Diego Superior Court denied the <u>Brady</u> claim with the following explanation:

> Here, [petitioner] purports to deduce from several exhibits that the "'bloody' root hairs, fibers and trace evidence from the victim's bloodstained bedspread" exist. He also asserts that these items were not turned over to the defense. However, as petitioner shows in his "ground" 3 (IAC), the exhibits purportedly showing the existence of those items were in defense counsel's possession. Moreover, petitioner's exhibits bear Bates-stamp numbers. Thus, this <u>Brady</u> claim was waived when it was not raised in the trial court.

(Lodgment No. 11, <u>In re Jernigan</u>, No. EHC 1031, order at 8.)

Second, Jernigan has provided no evidence the bloody root hairs and trace evidence from the bedspread were exculpatory. As Howard's May 10, 2007 report indicates, in 2005, the investigation was focused on identifying evidence to subject to new DNA testing techniques. (ECF No. 1, Attach. #6, 46-49.) Milton's DNA testing

occurred in late 2005 and early 2006, and by early 2006, Howard had obtained enough DNA evidence to secure an arrest warrant for Jernigan.  (Id. at 31-33.)  Howard's notes indicate that, in July of 2006, he, Freshwater, and Merritt visited the San Diego Sheriff's Office crime lab to view the purse, the purse contents, towels swatches and bedspread, presumably to identify additional items to subject to DNA testing.  (Id. at 61.)  Milton tested the purse, wallet, plastic photo card holder, and the bedspread in 2007.  (Lodgment No. 3, Rep.'s Tr. vol. 39, 7767-76.)  In any event, the exhibits Jernigan has provided do not establish the bloody root hairs and trace evidence were exculpatory.  Petitioner simply speculates that, if tested, they might have yielded exculpatory evidence.  And, because there was no exculpatory value to the allegedly suppressed evidence, he also has not established the third element of a Brady claim, materiality.  See Strickler, 527 U.S. at 281-82.

In section six ground two, Jernigan alleges the prosecution withheld other exculpatory evidence, namely that he gave blood to law enforcement in 1986.  (ECF No. 1, Attach. #6, 168-200.)  Petitioner has not met the elements of Brady for this claim either.  He refers to exhibits E, F, and G of section six, ground one, as support for this claim.  (Id.)  First, as with the preceding claim, Jernigan has not established the evidence was suppressed because the documents he claims support his claim are all bates-stamped indicating they were given to the defense during discovery.  (Id.)  Moreover, as discussed in section IV(A)(1)(b) of this Report and Recommendation, the evidence does not support a conclusion that the blood sample Jernigan claims he gave to police in 1986 was suppressed by the prosecution.  Second, there is no evidence the allegedly suppressed blood sample was exculpatory.  Jernigan gave a DNA sample in 2005, so it is not clear how a blood sample from 1986 would have changed the outcome of the DNA testing and subsequent trial.  (ECF No. 1, Attach. #3, 96.)  The existence of such a sample may have contradicted testimony by Lee, Quinn, and Howard who testified on rebuttal that Jernigan did not give a blood sample to police in the 1980's.  (Lodgment No. 3, Rep.'s Tr. vol. 45, 10883, 10886, 10898.)  Nevertheless, this impeachment evidence was not material.

Although it would have bolstered Jernigan's testimony that he gave a blood sample to police in the 1980's, it would have done nothing to counter the strong DNA evidence linking Jernigan to the murder.

### b. Prosecutorial Misconduct

Jernigan alleges the prosecutor committed misconduct in several ways. In section six, ground three, of his Petition, Jernigan contends the prosecutor presented false evidence by offering the testimony of Lee, Quinn, McElroy, and Howard who testified there was no evidence that Jernigan had given a blood sample to police in the 1980's. (ECF No. 1, Attach. #6, 170-200.) Petitioner also contends in this claim that the prosecutor committed misconduct when she asked him on cross examination whether he had seen any documentary evidence supporting his claim that he gave a blood sample to police in the 1980's. (Id.) Jernigan replied that he had not seen any such documents, but the prosecutor had in her possession, according to Jernigan, evidence that established such a blood sample existed. (Id.)

In section six, ground five, Petitioner lists three additional "acts" of prosecutorial misconduct. As act one, he maintains the prosecutor knowingly allowed Howard to testify that sixteen serological samples from the case were at the La Mesa Police Department in 2004, while knowing that at a hearing on a motion to determine whether law enforcement had maintained a proper chain of custody for the evidence, Howard had testified the sixteen serological samples were at the San Diego Sheriff's Department in 2004. (Id. at 205-09.) As act two, he argues the prosecutor committed misconduct when she allowed Howard to testify that a sheriff's department item history report assisted him in determining where certain items of evidence in the June George murder case were located. Petitioner claims the item history report could not have assisted Howard in this manner because the report did not track items once they left the possession of the sheriff's department. Jernigan contends there is no documentation as to where the sixteen serological samples were in 2004. (Id. at 209-11.) As act three, Petitioner asserts the prosecutor committed misconduct when she presented testimony by Howard, Lee, Quinn,

and McElroy that there was no evidence the victim's husband, Fred George, gave a blood sample to law enforcement in the 1980's or 1990's. (<u>Id.</u> at 211-14.) Jernigan contends that documents he has provided establish Sergeant Burke knew Fred George's blood type when he submitted items of evidence for testing to the Riverside Department of Justice laboratory in 1988. (<u>Id.</u> at 228-32.) Petitioner speculates that Fred George gave law enforcement a blood sample in 1988.

Jernigan raised his prosecutorial misconduct claims in the habeas corpus petition he filed in the California Supreme Court, which summarily denied the petition. (Lodgment No. 14, <u>Jernigan v. State of California</u>, [No. S227932] (petition for writ of habeas corpus [ECF No. 22, Attach. #28, 99-129, 134-50]); Lodgment No. 15, [<u>In re Jernigan</u>], California Courts, Appellate Courts Case Information, htpp://appellatecases. courtinfo.ca.gov/ (visited Dec. 28, 2015).) This Court must therefore "look through" to the last reasoned state court decision that addressed these claims to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. <u>See</u> <u>Ylst</u>, 501 U.S. at 805-06. Although Jernigan raised his prosecutorial misconduct claims in the habeas corpus petition he filed in the state appellate court, that court did not address the claims in its order denying the petition. (<u>See</u> Lodgment No. 12, <u>Jernigan v. State of California</u>, [No. D067991] (petition for writ of habeas corpus), No. 13, <u>In re Jernigan</u>, No. D067991, slip op. at 1-2.) Accordingly, the San Diego Superior Court's opinion denying the petition is the last reasoned state court decision.

The superior court addressed the merits of the claims Jernigan raises in section six, ground five, but found the claims raised in section six, ground three, were procedurally barred because they were not raised in the trial court or on direct appeal. (Lodgment No. 11, <u>In re Jernigan</u>, EHC1031, order at 9-10.) Nevertheless, the Court will exercise its discretion to decide the merits of this claim rather than determine whether it is procedurally defaulted. <u>See</u> <u>Batchelor</u>, 693 F.2d at 864. As to the claim raised in section six, ground five, therefore, this Court must conduct an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's

decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

Not every misstep by a prosecutor descends to the level of misconduct. "[I]t 'is not enough that the prosecutors' remarks [or actions] were undesirable or even universally condemned.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983)). Rather, a prosecutor commits misconduct when his or her actions "'so [infect] the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" Id. (quoting Donnelly, 416 U.S. at 642).

Jernigan's claim in section six, ground three, that the prosecutor committed misconduct by presenting false testimony that there was no evidence Jernigan had given a blood sample to police in the 1980's is a restatement of the same as his false evidence claim the Court addressed in section IV(A)(1)(b) of this Report and Recommendation. (See ECF No. 1, Attach. #6, 160-63.) As the Court has already concluded, Petitioner has not established the testimony by Howard, Lee, Quinn, and McElroy was false because with regard to the blood samples, the "seizure date" reflected in the San Diego County Sheriff's Department's documents does not correspond to the date the blood was obtained. (See Lodgment No. 3, Rep.'s Tr. vol. 33, 6732 (testimony of Chuck Merritt); id., Rep.'s Tr. vol. 35, 7092 (testimony of Chuck Merritt); id., Rep.'s Tr. vol. 37, 7308-11) (testimony of Vince Brown); id., Rep.'s Tr. vol. 38, 7560 (testimony of Kathy Keller).) Further, questioning Jernigan about whether there was documentary evidence to support his claim that he had given blood in the 1980's was well within the appropriate bounds of cross examination. See Sassounian v. Roe, 230 F.3d 1097, 1106-07 (9th Cir. 2000) (Prosecutor's comments about a defense witness's lies did not constitute prosecutorial misconduct.)

Petitioner's next prosecutorial claim concerns testimony about where serological samples were stored.  (ECF No. 1, Attach. #6, 205-09.)  Jernigan claims the prosecutor knowingly presented contradictory testimony by Howard about the location in 2004 of sixteen serological samples, when Howard began investigating the case.  (Lodgment No. 3, Rep.'s Tr. vol. 41, 8123-24, Aug. 2, 2011.)  Jernigan claims Howard testified at the chain of custody hearing that the serological samples were at the San Diego Sheriff's Department, but at the trial, he testified the samples were at the La Mesa Police Department.  (ECF No. 1, Attach. #6, 205-09.)  Petitioner contends the prosecutor committed misconduct by putting on this contradictory testimony.  Addressing this claim, the superior court wrote:

> 1.    "Prosecutorial Misconduct Act #1":  This alleged act of prosecutorial misconduct arises from Howard's testimony regarding the location of certain serological samples.
>
> In 2007, Howard testified at a "chain of custody hearing" that on December 17, 2004, "the 16 serological items were not at the La Mesa Police Department, they were at the Sheriff's Department."  (Petition, Vol. 4, "Section" 6, Exh. O, p. 465:11-23.)
>
> In 2011, Howard testified during trial that "serological samples that included the cutouts from the bedspread of June and Fred George, . . . the tissue that had been collected from the bathroom trash can by Chuck Merritt the evening of August 8th, 1986, as well as the victim's blood" "were located within the freezer section in the evidence room of the La Mesa Police Department" "at the time [Howard was] on the case following the testing by the Department of Justice."  (Id., Exh. P. p. 8129:12-25.)  During trial, Howard also testified that "La Mesa PD" had "that envelope containing the bath stains," the "right fingernail scrapings," "the eyeglass case from the purse," "the red towel," "the photo card holder," and "the cutout with the latent print with flecks of blood" (id., Exh. H. pp. 8186:4-8, 8186:12-14, 8186:24-8187:5) but that the San Diego Sheriff's Office Evidence Control Section had "that red purse," "the wallet," and vials of know blood belonging to four individuals (id., pp. 8186:15-23, 8187:6-13.)

/ / /

Petitioner alleges the 2011 testimony "was a deliberate perjured evidence testimony statement that was being intentionally perpetrated by the prosecution team upon the jury at trial. And this was a deliberate act of obstructing justice specifically by Prosecutor Schall, for knowingly allowing Investigator Howard to testify '<u>differently</u>', without addressing his <u>prior</u> under oath evidence testimony statement." (Petition, Vol. 4, p. 413, emphasis in original.) "At trial because of the knowingly allowed use by the prosecution team of known to be <u>perjured</u> evidence testimony statements[,] [t]he actual location 'whereabouts' of the critical serological samples during Investigator Howard's initial evidence inventory being at the LMPD on <u>December 17, 2004</u>, still remain unknown. It is <u>unknown</u> to [sic] if the serological samples were actually 'missing' and that this fact was being covered up by the prosecution (which would be an obstruction of justice), or if the serological samples were even in the possession of 'any' secure law enforcement agency on December 17, 2004." (<u>Id</u>., p. 414, emphasis in original.)

Petitioner contends the "Item History Report" and "Case and Item Report" from the San Diego Sheriff (Petition, Exh. Q) "absolutely document that the 16 serological samples were <u>not</u> in the possession of the Sheriff's property storage facility or any of it's [sic] employees during <u>the entire year of 2004</u>" (Petition, Vol. 4, p. 423, emphasis in original) and also suggests that they were in the possession of the La Mesa Police Department (<u>ibid.</u>)

Petitioner claims he was prejudiced by Howard's false testimony before the jury in 2011. However, he has not alleged facts sufficient to support the claim that the 2011 testimony was false. He has not shown the "16 serological items" addressed in the 2007 testimony correspond to the specific items address in the 2011 testimony. Even if he had made this showing he has not shown the date of inspection (12/17/04) at issue in 2007 was also at issue in 2011. Finally, petitioner's own interpretation of his Exhibit Q undermines an allegation that the 2011 testimony was false.

Moreover, even if petitioner had shown the 2011 testimony was false, this claim was waived by failing to raise it at trial when the contradiction between Howard's 2007 and 2011 testimony was known. (<u>See</u> <u>People v. Marshall</u> (1966) 13 Cal.4th 799, 830-831, <u>accord</u> <u>People v. Carrasco</u> (2014) 59 Cal.4th 924, 967.)

(Lodgment No. 11, <u>In re Jernigan</u>, No. EHC 1031, order at 12-13.)

Jernigan is correct that Howard's testimony appears to be contradictory. At the chain of custody hearing, Howard testified he went to the La Mesa Police Department on December 17, 2004, to view evidence, but he did not view the sixteen serological samples there because they were at the San Diego Sheriff's Department. (Lodgment No. 3, Rep.'s Tr. Mot, Hrg. vol. 4, 465, May 1, 2007.) At trial, he testified the La Mesa Police Department had the serological samples in 2004 and that in February of 2005, he transported them to the Sheriff's Department for testing. (Lodgment No. 3, Rep.'s Tr. vol. 41, 8130, 8186.) Nevertheless, "'the fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false.'" Boutlinghouse v. Hall, 583 F. Supp. 2d 1145, 1166 (C.D. Cal. 2008) (quoting United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997)). "The question whether witnesses lied or erred in their perceptions or judgments is properly left to the jury." Id. (citing United States v. Zuno-Arce, 44 F.3d 1420, 1422-23 (9th Cir. 1995); United States v. Scheffer, 523 U.S. 303, 313 (1998)).

Petitioner next claims the prosecutor committed misconduct when she presented misleading testimony by Howard that the San Diego Sheriff's "item history report" assisted him in determining where the sixteen serological samples were located. (ECF No. 1, Attach. #6, 209-11.) Jernigan contends the item history report could not have helped Howard locate the sixteen serological samples at the La Mesa Police Department because the item history report only tracked items of evidence which were in the possession of the Sheriff's Department and did not track where those items were sent or eventually ended up. (Id.) The superior court addressed this claim as follows:

> 2. "Prosecutorial Misconduct Act #2": This alleged act of prosecutorial misconduct again arises from Howard's testimony regarding the location of "the 16 serological samples."
>
> At the trial in 2011, Howard was asked, "based upon using that form [i.e., the item history report for the San Diego County Sheriff] and looking at items of evidence with La Mesa Police Department" (Petition,

Vol. 4, "section" 6, Exh. H, p. 8186:2-3) to state where certain items of evidence were located.  According to petitioner, the "item history report" used by Howard is in Exhibit Q to the petition.  Furthermore, petitioner contends, this "item history report" did not track evidence once it had left the San Diego Sheriff's possession.  However, petitioner does not show that Howard's testimony was inconsistent with the Sheriff's "item history report."  Nor does petition cite evidence to support his assertion that "the 16 serological samples were known to the prosecution team on December 17, 2004, as not being in the possession of 'any' secure law enforcement agency on December 17, 2004 . . . ."  (Petition, Vol. 4, p. 417, emphasis in original.)  Consequently, petitioner has not adequately alleged "Prosecutorial Misconduct Ad #2."

(Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 13-14.)

Investigator Howard testified at trial on redirect examination regarding the serological samples as follows:

Q.  All right.

Counsel went through certain inventory items and I believe you testified you used the Metropolitan Task Force, MTF, list that they had to check off whether or not certain items were accounted for, correct?

A.  Yes.  My initial meeting at La Mesa PD, yes, I did.

Q.  2004?

A.  2004.

Q.  You also testified that there was something you used from the Sheriff's crime lab to assist you in determining if they had possession of certain items; is that right?

A.  That's correct.

Q.  What was that?

A.  The Sheriff's crime lab has a listing of evidence they have in their possession and they have an evidence control form.  It's a chain of

custody within the Sheriff's crime lab that they keep updated on a
continual basis.

Q. For defense counsel's benefit, showing the witness, at this time, the
item history report for the San Diego County Sheriff, which they have. Is
this that control form you're talking about?
A. Yes, it is.

Q. All right.

Let's go through them with respect to the serological items. Based
upon using that form and looking at items of evidence with La Mesa
Police Department, who had the serological sample items, that envelope
containing the bath stains, the cutouts of the bedspread, the tissue, those
various items, the finger – right fingernail scrapings, who had that in
2004?

A. La Mesa PD, as I testified to.

(Lodgment No. 3, Rep.'s Tr. vol. 41, 8185-86.)

Jernigan has attached as Exhibit Q to section 6, ground 5, the San Diego Sheriff's

Item History Report to which Howard referred. (ECF No. 1, Attach. #6, 219-21.) It

indicates the serological samples were "put away" at the San Diego County Sheriff's

crime lab on January 23, 2001. (Id.) On September 6, 2001, the report states the samples

were "disposed" and the "destination/location" is listed as the La Mesa Police

Department. (Id.) They were "checked in" to the San Diego Sheriff again on

February 17, 2005. (Id.) The report by itself does not explicitly note the serological

samples were at the La Mesa Police Department in 2004. If, as Jernigan claims, the

report only tracked evidence that was in the possession of the San Diego Sheriff's

Department, it supports Howard's testimony. There are no entries which indicate the

serological samples were moved from the La Mesa Police Department between

September 6, 2001 and February 17, 2005. (Id.) Howard's testimony that he used the

item history report to help him locate the serological samples appears to be accurate.

/ / /

Petitioner's final prosecutorial misconduct claim alleges the prosecutor presented false testimony by Lee, Quinn, and McElroy that there was no evidence Fred George provided a blood sample to police in the 1980's. (ECF No. 1, Attach. #6, 211-14.) The superior court denied this claims as follows:

> 3. "Prosecutorial Misconduct Act #3": This alleged act of prosecutorial misconduct arises from rebuttal testimony given at trial by Howard and by La Mesa police officers Lee, Quinn and McElroy that there was no record that the victim's husband, Fred George, provided any blood samples during the 1980's or 1990's. Petitioner purports to refute this testimony with his Exhibit R, which he purports to be notes taken by Special Agent Ron Eicher of the Sacramento Bureau of Investigation of a conversation he had with Officer Burke . . . on July 13, 1988. According to these notes, Burke told Eicher that Fred George had blood type A. From this note, petitioner infers that Fred George must have given a blood sample to law enforcement on or before July 13, 1988.
>
> Petitioner's argument is not persuasive.

(Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 14.)

Jernigan points to notes made in 1988 by Agent Eicher, of the Riverside Department of Justice, as support for Petitioner's claim. In his notes, Eicher states Burke told him blood types B and O were found at the murder scene, and that June George was type B and Fred George was type A. (ECF No. 1, Attach. #6, 228-32.) There is no documentary evidence that establishes Burke learned Fred George had type A blood from a blood sample he gave to law enforcement in the 1980's. It is speculation that Burke's source of information was a blood sample. Thus, Jernigan has not established the testimony he objects to was false.

For all the foregoing reasons, the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. See Williams, 529 U.S. at 412-13. Nor was it based on an unreasonable determination of the facts. 28 U.S.C.A. § 2254. Jernigan is not entitled to relief as to these claims.

/ / /

/ / /

### 3. **Ineffective Assistance of Trial Counsel**

Jernigan claims his trial counsel was ineffective for many reasons. In what Petitioner describes as section one, ground six, he alleges trial counsel Plourd did not sufficiently challenge Milton's DNA testing at trial by more vigorously cross examining her about her errors and pre-trial testimony, and eliciting testimony from the defense DNA expert Marc Taylor. He also claims Plourd lied about his performance at the Marsden[6] hearing.[7] (ECF No. 1, Attach. #1, 15.) In what Petitioner describes as section four, ground seven, Jernigan contends Plourd failed to use favorable evidence in his defense, failed to object to the "use of 'improper' exculpatory DNA evidence" against Petitioner, failed to object to scientifically unreliable DNA being admitted against him, failed to move to suppress unreliable DNA evidence, failed to conduct adequate investigation into Milton's DNA errors, and failed "to pursue 'credible and necessary' defenses that were available and favorable to Mr. Jernigan at trial." (Id., Attach. #3, 111.) In section five, ground three, Jernigan claims Plourd failed to investigate and test the bloody root hairs and any trace evidence criminalist Steve Secofsky, of the California Department of Justice's Riverside Crime Laboratory, found on June George's clothes, the bedspread, and the bag used to transport the victim's body. (Id., Attach. #6, 14.) In what he identifies as section six, ground four, Petitioner alleges Plourd did not impeach Howard with evidence Jernigan had given a blood sample to law enforcement in 1986. (Id. at 140.) In section six, ground seven, Petitioner contends that Plourd did not introduce evidence that police had Fred George's blood sample in 1986 and that the

---

[6] Under People v. Marsden, 2 Cal. 3d 118 (1970), criminal defendants in California may ask the court to discharge their appointed attorney and appoint a new attorney when their right to effective representation is jeopardized.

[7] In section four, ground eight, Jernigan alleges the same claim, that Plourd committed misconduct by lying at the Marsden hearing about his efforts to challenge the DNA evidence and discredit Milton. (ECF No. 1, Attach. #1, 111; id. Attach. #5, 149-80; id. Attach. #6, 1-9.) This claim and the claim raised in section one, ground six, are without merit for the reasons discussed in section IV(A)(3) of this Report and Recommendation.

blood on the bedspread matched Fred George's blood type, not Petitioner's. (Id. at 141.) Finally, in section seven, ground three, Jernigan argues Plourd did not investigate testing errors committed by criminalist Merritt in the testing of the sink stain, the bedspread stain, and the towel. (ECF No. 1, Attach. #7, 33, 54-57.) Respondent counters that the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer 15-19, ECF No. 19.)

Jernigan raised these claims in the habeas corpus petition he filed in the California Supreme Court. (Lodgment No. 14, Jernigan v. State of California, No. S227932 (petition for writ of habeas corpus). That court denied the petition without citation of authority. (Lodgment No. 15, [In re Jernigan], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 29, 2015).) Again, this Court looks through to the last reasoned state court decision denying the claims. See Ylst, 501 U.S. at 805-06. Because the state appellate court did not address Jernigan's ineffective assistance of counsel claims, this Court reviews the San Diego Superior Court's opinion denying the claims to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. See id.

To establish ineffective assistance of counsel, a petitioner must first show his attorney's "representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. A petitioner must also show he was prejudiced by counsel's errors. See id. at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; see also Fretwell v. Lockhart, 506 U.S. 364, 372 (1993). Further, Strickland requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." Strickland, 466 U.S. at 689. There is a "strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance." Id. at 689. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. Id. at 697.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. The Strickland standard is a general one, so the range of applications is substantial. . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 562 U.S. at 105.

> a. Failure to Challenge the Validity of Milton's DNA Testing, Failure to Present Favorable Evidence, and Mishandling the Marsden Hearing

In section one, ground six, Jernigan alleges trial counsel did not do enough to challenge criminalist Milton's DNA test results. Petitioner claims counsel should have questioned Milton more thoroughly about her failure to adhere to lab protocols, such as running controls during testing, the aborted runs on the 310 Genetic Analyzer, the contamination of a blank control with unknown DNA, and her not reporting the test failure of well B-3 during her 2005 testing. (ECF No. 1, Attach. #1, 150-83.) He contends that due to these testing issues, none of Milton's DNA testing should have been reported, and counsel did not establish this during his cross examination of Milton or during his direct examination of Taylor, the defense expert. (Id. at 150-51.) Jernigan also claims Plourd lied at the Marsden hearing when he told the judge there was no evidence of falsified data or records in Milton's testing. Id. In section four, ground seven, Jernigan contends trial counsel Plourd failed to present favorable evidence at trial when he did not investigate or sufficiently challenge Milton's faulty DNA evidence and failed to object to or suppress Milton's DNA testing. (ECF No. 1, Attach. #5, 111-48.) In section four, ground eight, Petitioner claims counsel lied about his efforts to challenge the DNA evidence at trial. (ECF No. 1, Attach. #5, 149-80; id. Attach. #6, 1-9.) The San

Diego Superior Court addressed these claims as follows:

> In "ground" 7 ("section" 4), petitioner lists seven "claims asserted against Attorney Plourd for ineffective assistance of counsel." Except for claims (3) and (6), which mention Criminalist Milton, these claims are too vague to state a prima facie case for relief. The vagueness is not cured by his assertion "[t]he actual and necessary proof to prove all of these 'seven' assertions of ineffective assistance of counsel against Attorney Plourd 'constitutes' actual ineffective assistance of counsel have already been provided in the many documentations of 'factual' information contained in the many actual exhibits contained within all of the provided 'eight' Grounds for Relief claims." (Petition, Vol. 3, p. 284, emphasis in original.) By this point in his petition, petitioner has already set forth 29 "grounds" and cited 148 exhibits, yet he does not identify which "eight" of these 29 "grounds," and which of these 148 exhibits support these IAC claims.

> . . . .

> As summarized by the Court of Appeal (D060746, pp. 52-53; see also, Petition, Vol. 1, Exh. 27 [copy of transcript of first (9/3/2011) Marsden hearing]):

>> After he was convicted, Jernigan told the court he wanted to bring a motion asserting ineffective assistance of counsel, and the court held its first posttrial Marsden hearing. Jernigan told the court he had studied Milton's DNA testing and discovered various failings in her testing, as well as evidence suggesting Milton had falsified a testing run, and he also discovered she had testified in another proceeding that Glazebrook's DNA had been found on a tissue. Jernigan claimed he had provided all this evidence to trial counsel, who was to have used these facts as ammunition in either crossexamining Milton or in direct examination of Jernigan's expert. However, counsel did not do so at trial.

>> In response, Jernigan's trial counsel (Plourd) explained he had extensively discussed the case with Jernigan. Plourd, who had extensive expertise in DNA interpretation, explained that Simon Ford (a preeminent DNA expert) had been on Jernigan's case when Plourd took over, and Plourd had then hired Marc Taylor (another DNA expert) and met

with Taylor seven times to examine the DNA evidence. Although Taylor agreed some of Milton's work was sloppy, he told Plourd that Milton's results were accurate and he agreed with the prosecution's experts interpretation of the DNA evidence, and neither Taylor nor Ford had found any evidence Milton had falsified records. Although Plourd had considered each of Jernigan's charges, he explained the DNA evidence against Jernigan came from multiple experts (not just Milton) and it was necessary to have a strategy for dealing with the DNA evidence as a whole rather than just Milton's conclusions. Plourd's cocounsel explained the strategy was to discount the import of the DNA because Jernigan's DNA was not found in inappropriate places in the house, and fighting over the accuracy of the DNA evidence would have been tactically unsound because it would have made the DNA evidence (and where it was found) take on added importance in the jury's eyes.

The trial court denied Jernigan's motion for new counsel. The court noted his allegations required the court to believe the defense experts, who were "preeminent" experts, "did a sloppy job," and the court stated, "I'm not buying it." The court determined that Jernigan was merely "disgruntled" and, because Plourd had examined all of the evidence and "has done it professionally and competently," the motion to replace him as counsel would be denied.

The Court of Appeal concluded (id., p. 54.):

The denial of the first <u>Marsden</u> motion was not an abused of discretion. There was ample evidence counsel's actions were based on a competent and thorough investigation of the facts and represented informed tactical decisions that fell well within the bounds of reasonable advocacy.

Particularly in light of the Court of Appeal's above finding, petitioner does not cite objective evidence to overcome the presumption that whatever he perceives as deficient performance by attorney Plourd was the result of Plourd's reasonable tactical decisions.

(Lodgment No. 11, <u>In re Jernigan</u>, No. EHC 1031, order at 6-7.)

Criminalist Milton's DNA testing was the focus of significant litigation during the five years this case was prosecuted, including several discovery motions, a motion and hearing on the chain of custody of evidence, and a motion and hearing on pre-accusation delay. Milton was extensively cross examined about her DNA testing at both the hearings on the chain of custody and pre-accusation delay motions. (Lodgment No. 3, Rep.'s Tr. vol. 5, May, 2, 2007; Supp. Lodgment No. 1, Rep.'s Tr. Mot. Proceedings, Jan. 3 & 4, 2008.) And, contrary to Jernigan's claims, Milton was vigorously cross examined at trial about the "unexpected result," i.e., unknown DNA contaminating a control that was supposed to be blank, during her 2005-06 testing of the bedspread, tissue, bathroom stain, and eyeglass case. The jury also heard about the proficiency test she failed in 2010, several memos she wrote detailing "unexpected results" in other cases that occurred during the time period she was performing the testing in Jernigan's case, and results from her DNA testing that called into question the conclusion that Jernigan was the killer. (<u>See</u> <u>generally</u> Lodgment No. 3, Rep.'s Tr. vol. 39, 7783-7872) (cross examination of Connie Milton).)

In addition, defense expert Marc Taylor testified that in the bathroom stain and the fingernail scrapings, DNA from a low level male donor other than Jernigan was present. (Lodgment No. 3, Rep.'s Tr. vol. 43, 10455-56, 10469-75.) Taylor testified that Milton's DNA testing of the eyeglass case detected a very low level of DNA, and because Milton did not perform a substrate control test for that piece of evidence, there was no way to know whether the DNA detected came from the bloodstain or from the unstained portion of the case. (<u>Id.</u> at 10493-95.) Taylor also testified there was an unknown male's DNA in the sink stain and from the material under June George's right thumbnail, and there were similarities between the low level partial DNA profile Milton obtained from the red leather purse, which excluded Jernigan, and the low level partial DNA profile she obtained from the eyeglass case. (<u>Id.</u> at 10456-58, 10468-72, 10496-97.) Petitioner has not established what further cross examination on Milton's alleged errors and failure to

observe testing protocols counsel should have performed or how it would have altered the outcome of his case. See Strickland, 466 U.S. at 688, 694.

Jernigan also argues counsel should have cross examined Milton about the missing data from the B-3 well in her December 20, 2005 testing run. As previously noted, Petitioner contends Milton deliberately "omitted, deleted and destroyed" the results from the B-3 well, which he claims means the testing run was not valid and no results should have been reported. (ECF No. 1, Attach. #1, 150-51.) As support for this claim, he points to exhibits five, eight, and fifteen, which are attached to section one, ground one, of his Petition. Exhibit five is pages from the San Diego Sheriff's Department Procedure manual that outlines procedures for reporting DNA test results; exhibit eight is Milton's Quantifiler results table that shows no results for the B-3 well, and exhibit fifteen is the San Diego County Sheriff's Crime Lab manual that outlines what corrective actions will be taken for errors in testing. (Id. at 35-43, 50-52, 86-90.) Specifically, exhibit five to section one, ground one, states that a criminalist should view the "standard curve" and the "amplification plot" and determine whether they meet certain criteria. If they do, "the sample run can be accepted as valid." (Id. at 35-43.) Jernigan contends that because there are no reported results from the B-3 well during Milton's December 20, 2005 testing run, the results from well B-3 did not meet exhibit five's criteria, and thus the run should not have been reported.

Petitioner has not established the prejudice prong of Strickland with regard to these allegations. There is no evidence the data from the B-3 well was favorable to Jernigan's case. The B-3 well was a control sample that contained a quantity of known DNA, not a piece of evidence related to the murders. Moreover, although Jernigan claims the results from the B-3 well were not included in the Quantifiler results table because they did not meet the standards set forth in the San Diego Sheriff's Department Procedure Manual section 9.8.6.2.9 and thus the results from the December 20, 2005 run were "unreportable," this is speculation. There is no evidence in the record as to why the

///

46

results were not reported, and as noted above, in section IV(A)(1)(a) and (b), the standard DNA from well B-3, standard 8, was also tested and reported in well B-4. (Id. at 47-52.)

To the extent Jernigan claims the missing B-3 data is evidence of fraud by Milton, defense DNA expert Taylor testified he agreed with the ultimate conclusions Spurgeon, Rogala, and Milton reached about what the DNA testing showed. (Lodgment No. 3, Rep.'s Tr. vol. 43, 10509-12.) In addition, as counsel noted during the Marsden hearing, Taylor was of the opinion that although Milton's testing was sloppy in some respects and she did not follow protocols in all her testing, those deficiencies did not affect the ultimate results of Milton's testing or the conclusions she reached based on that testing and that there was no evidence of fraud. (Lodgment No. 3, Rep.'s Tr. vol. 47-A, 11156-58.) Finally, even discounting Milton's DNA testing, DNA evidence from Spurgeon, Rogala, and Sonnenberg incriminated Petitioner. Spurgeon concluded Jernigan was the major contributor to two stains on the bedspread; Rogala testified that Jernigan could not be eliminated from the bathroom stains, and Sonnenberg concluded Jernigan was the sole contributor to a stain on the towel. (Lodgment No. 3, Rep.'s Tr. vol. 33, 6815-16; id. vol. 35, 7173-75; id. vol. 40, 8055-56.) Questioning Milton about the missing B-3 well results would not have changed the outcome of Petitioner's case. See Strickland, 466 U.S. at 694.

Petitioner alleges counsel did not object to, or seek to suppress, "scientifically unreliable DNA evidence." (ECF No. 1, Attach. #5, 112.) The attorney who represented Jernigan before Plourd, Bart Sheela, filed a motion to exclude evidence based on a failure to establish proper chain of custody of the evidence. (Lodgment No. 1, Clerk's Tr. vol. 1, 20-26.) Sheela sought to exclude the physical evidence collected at the scene, including the blood and serological samples on which the DNA was based. A multi-day hearing was held on the motion and many witnesses, including Milton, were called, and the motion was eventually denied. (Lodgment No. 3, Rep.'s Tr. vols. 3-5, April 30, May 1, May 2, 2007.) Moreover, as discussed above, under California law, errors in testing go to the weight of the evidence, not its admissibility. Cooper, 53 Cal. 3d at 814, 281 Cal.

Rptr. at 113, 809 P. 2d at 888 (quoting <u>Farmer</u>, 47 Cal. 3d at 913, 254 Cal. Rptr. at 524, 765 P. 2d at 956). In addition, several discovery motions were litigated, and Jernigan was successful in obtaining a vast cache of documents relating to the Sheriff's Department Crime Lab procedures, memoranda detailing Milton's work history and errors she committed while a criminalist, and the original raw data from Milton's DNA testing: all information that was used to craft his defense and cross examine the prosecution's DNA witnesses. (Lodgment No. 3, Rep.'s Tr. vol. 2, Sept. 7, 2006; <u>id.</u> vol. 6, July 5, 2007, <u>id.</u> vol. 7, July 11, 2007; Lodgment No. 3, Rep.'s Tr. vol. 14, Mar. 26, 2008; Lodgment No. 3, Rep.'s Tr. vol. 21, Aug. 13, 2009; <u>id.</u> vol. 22, Oct. 7, 2009; <u>id.</u> vol. 23, Jan. 8, 2010; <u>id.</u> vol. 25, June 18, 2010.) Jernigan has not specified what further investigation of Milton should have been done by trial counsel and what information he would have obtained from that investigation. Accordingly, Petitioner has not satisfied either prong of <u>Strickland</u> with regard to this allegation. See <u>Strickland</u>, 466 U.S. at 688, 694.

### b. <u>Failure to Investigate Exculpatory Evidence</u>

In section five, ground three, Petitioner claims Plourd failed to investigate and present exculpatory evidence, specifically the bloody root hairs and trace evidence he contends were in the possession of the California Department of Justice, Riverside. (ECF No. 1, Attach. #6, 84-108.) In support of this claim, he attaches a discovery motion filed by Plourd in which Plourd states he reviewed all of the laboratory documentation of the California Department of Justice and a copy of a page from Plourd's discovery log. (<u>Id.</u> at 90-108.) The San Diego Superior Court concluded that Jernigan had cited "no objective evidence in support of his assertion that attorney Plourd failed to 'visit,' 'discover,' and/or 'investigate' as alleged [in his petition]. This is insufficient to state a prima facie case for IAC." (Lodgment No. 11, <u>In re Jernigan</u>, No. EHC 1031, order at 9.)

"[Defense] counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691. "This includes a duty to investigate the prosecution's case and to follow up

on any exculpatory evidence." <u>Ratliff v. Hedgepeth</u>, 712 F. Supp. 2d 1038, 1073 (C.D. Cal. 2010) (citing <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 385 (1986)). "'[A] lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.'" <u>Riley v. Payne</u>, 352 F.3d 1313, 1318 (9th Cir. 2003) (citation omitted) (quoting <u>Avila v. Galaza</u>, 297 F.3d 911, 919 (9th Cir. 2002)). "To show prejudice, the petitioner must demonstrate that further investigation would have revealed favorable evidence." <u>Ratliff</u>, 712 F. Supp. 2d at 1073 (citations omitted).

First, Jernigan has not established Plourd did not investigate the bloody root hairs and trace evidence. In fact, the two exhibits he cites indicate Plourd knew about the evidence. Counsel could have reasonably concluded that any further investigation of the bloody root hairs and trace evidence would not have helped Jernigan's case because either it would not have eliminated Petitioner as a suspect or that no useful DNA evidence could be gleaned from it. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable . . . . [but] whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, 562 U.S. at 105. Jernigan has not established prejudice because he has not shown counsel would have discovered exculpatory evidence had he investigated the bloody root hairs and trace evidence. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. Accordingly, he is not entitled to relief as to this claim.

### c. Failure to Impeach Prosecution Witnesses with 1986 Blood Sample Evidence

Jernigan next claims in section six, ground four, that counsel was ineffective when he failed to confront prosecution witness Michael Howard with evidence that contradicted his claim that Petitioner had not provided a blood sample to police in 1986. (ECF No. 1, Attach. #6, 201-04.) Petitioner testified he did provide a blood sample.

///

(Lodgment No. 3, Rep.'s Tr. vol. 42, 8346.) The San Diego Superior Court addressed this claim as follows:

> As to IAC, petitioner contends attorney Plourd's performance was deficient because he failed to "impeach" DA Investigator Howard by showing that, when Howard testified there was no documentation of petitioner giving a 1986 blood sample, Howard had in fact seen at least Exhibit E (indicating petitioner had given a 1986 blood sample). Petitioner does not clearly articulate how petitioner was prejudiced by a failure to "impeach" Howard. Petitioner does not suggest the (alleged) fact he gave blood in 1986 was by itself material. Rather, it appears petitioner is concerned his own credibility with the jury was impaired by the prosecution's rebuttal of his claim he had given blood in 1986. (See, e.g., Petition, Vol. 4, p. 414.) However, as the Court of Appeal notes, petitioner's testimony was rebutted on several other issues as well (D060746, pp. 12-14, emphasis added):

>> A major theme of Jernigan's defense at trial consisted of the alleged acts and omissions of La Mesa Police Officer Burke (deceased at the time of trial). Jernigan testified he spoke to Burke on August 11, 1986, at the La Mesa Police Department and was asked to lift his shirt and have his hands and arms examined. Jernigan had no scratches on his arm. Jernigan received a call later that week and was asked to return to the station. At that time, Burke asked him about Kathy's alleged drug use. Jernigan told Burke she did not use drugs. When Burke claimed a Ms. Seljan told him that Kathy and Seljan had used methamphetamine together, Jernigan did not believe him.

>> Jernigan testified he was scheduled to again return to the station about a week and a half later but fell asleep. When he woke, Burke was at his house. Burke asked about June and Fred's relationship, and also inspected Jernigan's shoes. In rebuttal, La Mesa Officer Howard testified he had reviewed all of the records relating to the investigation, and there was no record of Burke going to Jernigan's house, or any reports that Burke had asked to see Jernigan's shoes. Howard explained that, to do a shoeprint comparison, it would have been necessary to impound the shoes, not merely view them at a residence. Jernigan testified Burke also asked

him to show Burke where in the complex the man who was in the laundry lived, and Jernigan walked with Burke down the pathway to the back side of the complex. <u>In rebuttal, Howard also testified there was no record of Burke going to the residence of the man who allegedly saw Jernigan doing laundry</u>.

Jernigan testified Burke also asked him at that time for a copy of his telephone bill because he was on the telephone while doing his laundry on the afternoon of the murder. Jernigan took a copy of the bill to Burke when it arrived. In rebuttal, Howard also testified there was no record or reports of Jernigan telling Burke he was on the telephone during the time of the murder. Howard found no telephone records belonging to Jernigan, and the first time Howard heard of this claim was after Burke died.

In May 1988, Burke asked Jernigan to come to the police station again because Burke was interested in a drug dealer, Joe Maraneci, a friend of Kathy's with whom she lived after June's death. After the interview, Burke drove an unmarked police car, and Jernigan sat in the front seat and directed Burke to Maraneci's residence. [FN 1]

> [FN 1: In rebuttal, La Mesa Officer McElroy testified he was with Burke when they interviewed Jernigan in May 1988. After the interview, McElroy saw Burke walk Jernigan to the lobby at the front of the building, the normal path for an interviewee to leave. The unmarked cars available to Burke were parked at the back of the building. McElroy also testified that, under the policy and procedures in effect at that time, an officer would never go alone with a civilian seated in the front to locate an individual's address. Instead, two officers would go, with the assisting civilian seated in the back seat (where there were blacked out windows), and one officer would drive and the second would record the address or descriptions of the person the officers were seeking.]

15cv2793 BTM (RBB)

Because Maraneci was not home, they returned to the police department and Burke asked Jernigan to look at some photographs to help identify Maraneci. Jernigan waited in an interview room and Burke left, returning with a bag with a purse in it. Burke removed numerous items from the purse and put them on the desk in front of Jernigan. Jernigan saw the photographs and believed they were from Kathy's purse, and did not know the items had come from June's purse. He and Burke, wearing neither gloves nor masks, went through the photographs trying to find one of Maraneci. Jernigan handled both the photographs and the wallet from the purse. He did not believe he had any injuries that day, but he had just come from playing football when Burke arrived at his house that day. In rebuttal, Howard testified there was no record or reports of Burke showing June's wallet to Jernigan. McElroy also testified, based on his personal observations, that Burke always wore gloves when handling evidence in an open major case investigation. McElroy testified that, under the policy and procedures in effect at that time, (1) a civilian was never allowed to handle impounded evidence in an open major case investigation and (2) McElroy had never seen Burke permit a civilian to handle impounded evidence in an open major case investigation. Finally, McElroy explained, the way to obtain photographs of people of interest was either to get copies of a mug shot (if the person had previously been arrested) or a DMV photograph.

Howard also gave rebuttal testimony regarding the 1986 blood sample (Petition, Vol. 4, "Section" 6, Exh. J, pp 10898:7-14, 22-27). Petitioner might be arguing that had Howard been cross-examined regarding the accuracy of his rebuttal testimony regarding the 1986 blood sample, the credibility of his other rebuttal testimony (see, Court of Appeal's recitation above, and Exh. J, p. 10899) regarding the "major theme" of Officer Burke's "alleged acts and omissions" would have been undermined. Yet, petitioner does not suggest that there were, despite Howard's rebuttal testimony to the contrary, any records or reports to support petitioner's trial testimony regarding Officer Burke's "alleged acts and omissions"; i.e., petitioner has not adequately alleged prejudice.

(Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 10-11.)

Jernigan refers to Exhibits E, F, and G to section 6, ground one, as support for this

claim.  Exhibit E is a County of San Diego Sheriff's Department Case and Item Listing that lists "Vials Known Blood Sample: Marc Jernigan and a seizure date of August 8, 1986;"  Exhibit F is a San Diego County Sheriff's Department Case, Item and Inquiry Report which also indicates an item titled "Vials Known Blood Sample Marc Jernigan," and seizure date of August 8, 1986; and Exhibit G is a San Diego Sheriff's Department Case and Item Report which lists "Vials Known Blood Sample Marc Jernigan," and a seizure date of August 8, 1986.  (ECF No. 1, Attach. #6, 160-67.)  But as discussed above in section IV(A)(1)(b) of this Report and Recommendation, the "seizure date" reflected in the San Diego County Sheriff's Department's documents does not conclusively establish the date the item was seized, at least with regard to the blood samples.  The documents list a seizure date of August 8, 1986, the date of the murder, for Jernigan, June George, David George, and Kathy Keller, despite the fact that Jernigan testified he gave blood the following day, August 9, 1986; Merritt testified he obtained June George's blood sample on August 9, 1986; and Officer Brown testified he obtained blood samples from David George and Kathy Keller on January 31, 2001.  (Id. at 160-63; Lodgment No. 3, Rep.'s Tr. vol. 33, 6716, 6732; id. vol. 35, 7092; id. vol. 37, 7310-11; id. vol. 38, 7560.)  Given this, it was a reasonable strategic decision for counsel not to confront the prosecution's witnesses with the documents to which Jernigan refers.  See Strickland, 466 U.S. at 688.  The prosecutor would have established on re-direct examination that the documents did not refer to the actual dates the items were seized.  For the same reason, Petitioner has not established any prejudice from counsel's failure to confront the witnesses with the documents.  See id. at 694.  Any such attempt would not have assisted Jernigan's defense.

Petitioner also contends counsel should have confronted Howard with testimony he gave at the chain of custody hearing which contradicted his trial testimony regarding the location of Jernigan's blood sample.  (ECF No. 1, Attach. #6, 143-45.)  At the chain of custody hearing, Howard testified Jernigan's blood sample was at the La Mesa Police Department in 2004.  (Lodgment No. 3, Rep.'s Tr. vol. 4, 473-74.)  At trial, he testified

Jernigan's blood sample was at the San Diego Sheriff's Department. (Lodgment No. 3, Rep.'s Tr. vol. 41, 8187.) Jernigan contends this shows there were two separate vials of his blood, one at the La Mesa Police Department and one at the San Diego Sheriff's Department. (ECF No.1, Attach. #6, 144.) Petitioner argues that counsel had confronted Howard with this discrepancy, it may have diminished his credibility with the jury. But even if a second blood sample from Jernigan existed, any discrepancy between Howard's pre-trial and trial testimony could have been reconciled on redirect examination. Petitioner has not established he was prejudiced by counsel's failure to do so. See Strickland, 466 U.S. at 694. Howard's alleged mistaken testimony would not have changed the outcome of the trial in the face of the DNA evidence implicating Jernigan. Howard believed there was no evidence that Petitioner had given a blood sample to police in 1986, and Officers Lee and Quinn also testified Jernigan did not give a blood sample to police in the 1980's. (See Lodgment No. 3, Rep.'s Tr. vol. 45, 10883, 10886, 10898-99.) Jernigan has not shown any such blood sample would have been exculpatory in any event.

### d. Failure to Present Blood Type Evidence

Jernigan contends in section six, ground seven, that counsel should have presented evidence that Detective Burke found the presence of blood type A on the blood-stained bedspread. (ECF No. 1, Attach. #7, 26-30.) He claims this evidence was suppressed by the prosecution and law enforcement and would have exonerated him had counsel confronted the prosecutor and the prosecution witnesses with the information. (Id.) Jernigan points to several exhibits as support for his claim. The superior court did not address this claim, so this Court must independently review the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

Jernigan first points to Exhibit R to section six, ground six, which consists of notes

made in 1988 by Agent Eicher, of the Riverside Department of Justice, as support for Petitioner's claim. (ECF No. 1, Attach. #6, 228-32.) Eicher's notes, however, state Burke told him blood types B and O were found at the murder scene, not type A, and that June George was type B and Fred George was type A. (Id.) This evidence does not support Jernigan's claim, counsel was not ineffective for failing to use the information at trial.

Petitioner also points to Exhibit T of section six, ground six, which Jernigan claims are notes taken from Burke's deposition during a civil lawsuit against the La Mesa Police Department by Gerald Glazebrook, who was an early suspect in June George's murder. (ECF No. 1, Attach. #6, 236-40.) On the second page of the exhibit is a description of deposition testimony which states, "Sergeant Burke says that the Sheriff's lab reported 'his' (the suspect's) blood to be type A." (Id. at 239.) Exhibit V of section six, ground six, however, is a laboratory services report from the San Diego County Sheriff's Department that states the bloodstain on the bedspread was type H. (ECF No. 1, Attach. #7, 6-12.) According to Chuck Merritt, blood factor H is consistent with a type O person. (Lodgment No. 3, Rep.'s Tr. vol. 33, 6742.) Jernigan states he has type O blood. (ECF No. 1, Attach. #7, 6-12.) The lab report of the bloodstains on the bedspread does not state that type A blood was found on the bedspread, and the report is a more reliable record than notes describing deposition testimony. It was objectively reasonable for counsel not to pursue this discrepancy further. See Strickland, 466 U.S. at 688.

In any event, Jernigan has not established he was prejudiced by counsel's actions. See id. at 694. Given that the DNA evidence, which was much more sensitive, precise, and incriminating, established the bloodstains on the bedspread were consistent with Jernigan's DNA profile, any cross examination regarding the blood typing of the stains would not have changed the outcome of the case. See id.

### e. Failure to Present Evidence of False Testimony by Merritt

Finally, in section seven, ground three, Jernigan argues trial counsel was ineffective because he failed to challenge the blood testing and testimony of Chuck

Merritt. (ECF No.1, Attach. #1, 54-65.) Specifically, Petitioner claims counsel should have challenged all of Merritt's initial testing of the blood evidence taken from June George's house because the notes Merritt took during his testing of the fingernail scrapings are inconsistent with his testimony at trial. (Id.) Jernigan claims this establishes the evidence and testimony Merritt presented at trial was false. He also contends counsel should have challenged the DNA testing later performed on the blood based on Merritt's alleged false evidence, and that counsel hid his knowledge of these failures from appellate counsel. (Id.) The San Diego Superior Court did not address this claim, and thus this Court must conduct an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

Although Merritt's trial testimony that all the fingernail scrapings tested presumptively positive for blood may have been inconsistent with his testing notes, any failure by counsel to question Merritt about those inconsistencies was a reasonable strategic choice. See Strickland, 466 U.S. at 688. During cross examination, Plourd questioned Merritt extensively about how he gathered evidence at the crime scene, what precautions he took to prevent contamination of evidence, how he stored the evidence, how he tested the evidence, and how he could have contaminated some evidence with his DNA. (Lodgment No. 3, Rep.'s Tr. vol. 33, 6760-95.) Given that later testing by Milton established the presence of blood in the fingernail scrapings, Plourd's decision to focus his cross examination of Merritt on areas of inquiry that were more helpful to Jernigan's case was reasonable. Moreover, Jernigan has not shown he was prejudiced by counsel's decision not to question Merritt about his presumptive blood testing. See Strickland, 466 U.S. at 694.

Inconsistencies between Merritt's notes and his trial testimony does not establish that Merritt's testing or the subsequent DNA testing was false. Like Merritt, Milton

tested the fingernail scrapings, bathroom stain, bedspread stains, and towel stains and found they tested positive for the presence of human blood. Milton also found that Jernigan was the major contributor to DNA found on a bedspread stain, three stains on the towel, and was the sole source of one stain on the towel. (Lodgment No. 3, Rep.'s Tr. vol. 39, 7741-43, 7762-64; ECF No. 1, Attach. #7, 137-43, Attach. #8, 1.) In addition, she found one rare allele which was consistent with Petitioner's DNA, and there were stains on June George's wallet that Milton testified contained a single source of DNA matching Jernigan. (Lodgment No. 3, Rep.'s Tr. vol. 39, 7769, 7775.) Rogala's testing found Jernigan could not be excluded from the bathroom stain. (Lodgment No. 3, Rep.'s Tr. vol. 33, 6816.) And the fingernail scraping evidence did not implicate or exonerate Jernigan because no identifiable DNA was found in the fingernail scrapings other than June George's. (ECF No. 1, Attach. #7, 139.)

For the foregoing reasons, the state court's denial of Jernigan's ineffective assistance of trial counsel claims was objectively reasonable, and the denial was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. See 28 U.S.C.A. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts. See id.(d)(2). Jernigan is not entitled to relief as to his ineffective assistance of trial counsel claims.

### 4. **Tampering with and Destroying Exculpatory Evidence**

Jernigan claims in what he describes as section one, ground one, and section six, ground six, of his Petition that criminalist Milton and La Mesa Police Sergeant Chuck Burke tampered with and destroyed exculpatory evidence. (ECF No. 1, Attach. #1, 140-41.) Specifically, Petitioner alleges Milton intentionally destroyed the results from well B-3 of her December 20, 2005 test run in order to ensure the test run was validated. (Id. at 23-94.) Jernigan alleges Burke omitted information from the police reports he composed and did not reveal the blood on the bedspread, which Burke believed belonged to the murder suspect, was type A; Fred George was also type A blood, according to Jernigan. (ECF No. 1, Attach. #6, 222-40; id. Attach. #7, 1-25.) Petitioner claims the

blood type evidence withheld by Burke was exculpatory because, in conjunction with the finding that Jernigan's and Merritt's DNA was found on the bedspread, the withheld evidence established the bloodstain was old and belonged to Fred George, not Petitioner. (Id.) Jernigan claims that by withholding this evidence, Burke "destroyed" it. (Id.) In section nine, ground three, Jernigan alleges law enforcement failed to preserve a copy of a telephone bill he claims he gave to Burke, DNA from a "bloody fingerprint" on June George's wallet photo holder, and DNA on the murder weapon. (ECF No. 1, Attach. #8, 135-36; Lodgment No. 5, Appellant's Opening Brief at 44-55, People v. Jernigan, No. D060746.)

Jernigan raised the claims in section one, ground one, and section six, ground six, in the habeas corpus petition he filed in the California Supreme Court. (Lodgment No. 14, Jernigan v. State of California, No. S227932 (petition for writ of habeas corpus).) The California Supreme Court summarily denied the petition. (Lodgment No. 15, [In re Jernigan], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).) This court must therefore turn to the last reasoned state court decision addressing the claims to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. Ylst, 501 U.S. at 805-06. Because the state appellate court did not address the claims, the San Diego Superior Court's opinion denying the claims is the last reasoned state court decision. See id. The superior court addressed Jernigan's claims regarding Burke, but did not address his claims regarding Milton's testing. (Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 9-11.) As a result, with regard to Milton's testing, this Court must conduct an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

///

As to the claims in section nine, ground three, Petitioner raised those claims in the petition for review he filed on direct appeal. (Lodgment No. 8, People v. Jernigan, No. [S215964].) The California Supreme Court summarily denied the petition for review. (Lodgment No. 9, People v. Jernigan, No. S215964, order at 1.) The last reasoned state court decision as to the claims raised in section nine, ground three, is the appellate court's opinion denying the claims. (Lodgment No. 7, People v. Jernigan, D060746, slip op. at 2, 14-22.)

Respondent argues Jernigan's claims regarding Milton's DNA testing and Burke's blood type evidence are procedurally defaulted because although the San Diego Superior Court addressed the merits of Jernigan's claims regarding Burke, it also found that Jernigan had forfeited his claims because he did not raise the issue at trial. (Answer 16-17, ECF No. 19; Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 14-15.) Respondent also argues that the claims are meritless. (Answer 17, ECF No. 19.) Respondent does not address Jernigan's claims regarding the telephone bill, the wallet photo holder, and the murder weapon.

The Ninth Circuit has held that a court's discretion to resolve questions of procedural default "should be exercised to further the interests of comity, federalism, and judicial efficiency." Boyd, 147 F.3d at 1127 (citations omitted). Thus where, as here, deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claims on their merits. See Batchelor, 693 F.2d at 864. Accordingly, this Court will address the merits of Jernigan's claims.

A claim that the prosecution failed to preserve evidence is akin to a Brady claim. In California v. Trombetta, the Supreme Court held that law enforcement has a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense." 467 U.S. 479, 488 (1984) (footnote omitted). "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant

would be unable to obtain comparable evidence by other reasonably available means." Id. (internal citation omitted). The Supreme Court in Arizona v. Youngblood, 488 U.S. 51, 57 (1988), held that due process "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Such a failure to preserve does not violate due process "unless a criminal defendant can show bad faith on the part of the police." Id. at 58.

In addressing Jernigan's claims focusing on Burke and the blood-type evidence, the superior court stated as follows:

> Petitioner's Trombetta/Youngblood claim is based on the allegation that Officer/Sergeant Burke "did intentionally omit from all documented police records that": (1) "the LMPD had possession of [petitioner's] known 1986 blood evidence information"; (2) "the LMPD had possession of Fred George's known blood evidence information"; (3) "his acquired knowledge that the blood type found on the victim's bedspread was '**identified**' as being that of blood type 'A,' and that it had matched Fred George's know blood type 'A'"; and (4) "his acquired knowledge that the blood type found on the victim's bloody wallet print was '**identified**' as being that of blood type 'B', and that it had matched June George's blood type 'B'" (Petition, Vol. 4, pp. 427-428, emphasis in original).

> As to (1), petitioner does not show that Burke knew LMPD had possession of petitioner's "known 1986 blood evidence information," and therefore does not show he failed to preserve that information.

> As to (2), (3) and (4), petitioner does not show this blood type information was "not obtainable 'by other reasonably available means.'"

> Consequently, even assuming petitioner has shown any of the above evidence was exculpatory, he has not established a Trombetta/Youngblood violation.

> In any event, petitioner forfeited this issue by failing to raise it at trial. (See, People v. Chism (2014) 58 Cal.4th 1266, 1300, citing People v. Duran (1976) 16 Cal.3d 282, 289.)

(Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 14-15.)

With regard to the well B-3 results, Jernigan has not met his burden under either Trombetta or Youngblood.  The well B-3 results did not have an "exculpatory value that was apparent before the evidence was destroyed."  Trombetta, 467 U.S. at 488.  Well B-3 did not contain Jernigan's DNA or DNA samples from the murder scene.  Rather, well B-3 was one of two wells which contained standard 8, a standard DNA sample, which was run as a control during one of Milton's test runs.  The other well containing standard 8, well B-4, was reported.  (ECF No. 1, Attach. #1, 47-52.)  Moreover, even if the well B-3 data was discarded or corrupted, the San Diego Sheriff's Department manual on DNA testing does not require Milton to discard the December 20, 2005 test run.  The manual states that "[i]f the standard and amplification data meet the criteria listed above, the sample run can be accepted as valid."  (Id. at 35-43 (emphasis added).)  Because well B-4 contained standard 8 and was reported, the testing run conformed to the manual's requirement.  In addition, there is no evidence, beyond Jernigan's assertions and speculation, that Milton destroyed the well B-3 results in bad faith.

Petitioner also has not met his burden under Trombetta and Youngblood with regard to the blood type evidence.  As he did in section IV(A)(3)(e), Jernigan points to Exhibits R and T to section six, ground six, as support for this claim.  (ECF No. 1, Attach. #6, 222-27.)  Exhibit R, Eicher's notes, state Burke told him blood types B and O were found at the murder scene, not type A, and that June George was type B and Fred George was type A.  (Id. at 228-32.)  Exhibit T is notes referring to Burke's deposition, one of which states that "Sergeant Burke says that the Sheriff's lab reported 'his' (the suspect's) blood to be type A."  (Id. at 239.)  As this Court noted in section IV(A)(3)(e), however, Exhibit V, the laboratory services report from the San Diego County Sheriff's Department states the bloodstain on the bedspread was type H.  (ECF No. 1, Attach. #7, 6-12.)  Merritt testified at trial that blood factor H is consistent with a type O person.  (Lodgment No. 3, Rep.'s Tr. vol. 33, 6742.)  According to Jernigan, he has type O blood.  (ECF No. 1, Attach. #7, 6.)  Thus, Petitioner has not met his burden under Trombetta because the blood type evidence was not exculpatory.  See Trombetta, 467 U.S. at 488.

Further, there is no support in the record that any blood type evidence was destroyed in bad faith. See Youngblood, 488 U.S. at 58. Accordingly, as to Petitioner's claims relating to the testing performed by Milton, the Court has conducted an independent review and concluded that the state court decision denying the claims was objectively reasonable.

With regard to Jernigan's claims about the missing, bloody fingerprint and murder weapon, the state appellate court analyzed these claims as follows:

> Regarding both the blood flecks around the edge of the print and the alleged blood evidence on the knife, Jernigan's argument is that these should have been better preserved because they might have been subjected to testing 20 years later to extract possible exculpatory DNA. However, the court found Jernigan's showing was inadequate to prove either these items had some exculpatory value known to police at the time the items were not preserved, or there was any evidence of bad faith by the authorities when they failed to preserve these items for later scientific testing. In Youngblood, the court rejected the appellant's due process claim on analogous facts. The appellant in Youngblood argued, among other things, that the failure to properly refrigerate clothing from the victim prevented him from testing it to determine if it provided exonerating evidence and therefore warranted sanctions. (Youngblood, supra, 433 U.S. at pp. 54-55.) Rejecting the argument, Youngblood observed:
>
> > "[T]he Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in Trombetta, supra, 467 U.S., at [p] 486 . . . that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, [citation] as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary

significance in a particular prosecution.  We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form the basis for exonerating a defendant.  We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.  [¶]  In this case, the police collected the rectal swab and clothing on the night of the crime; respondent was not taken into custody until six weeks later.  <u>The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent.</u>  None of this information was concealed from respondent at trial, and the evidence – such as it was – was made available to respondent's expert who declined to perform any tests on the samples.  The Arizona Court of Appeals noted in its opinion – and we agree – that there was no suggestion of bad faith on the part of the police."  (<u>Id.</u> at pp. 57-58.)

Jernigan did not show that either the blood flecks or the murder weapon had some exculpatory value <u>known</u> to police at the time the items were not preserved.  Moreover, as noted by the court when ruling on the motion, defense counsel conceded the defense showing at the hearing on his <u>Trombetta</u> motion did not demonstrate police acted in bad faith when they decided not to preserve either the blood flecks or the murder weapon.  We conclude that, as to these items, substantial evidence supports the court's ruling.

(Lodgment No. 7, <u>People v. Jernigan</u>, D060746, slip op. at 17-19.)

The state court correctly concluded the "bloody fingerprint" and the murder weapon did not possess "an exculpatory value that was apparent before the evidence was destroyed," <u>Trombetta</u>, 467 U.S. at 488, but were rather only potentially exculpatory, <u>see</u> <u>Youngblood</u>,  488 U.S. at 57.  Arlynn Bove, a criminal investigator for the San Diego County Sheriff's Department, processed the "bloody fingerprint" from the plastic photo

holder in June George's wallet.   (Lodgment No. 3, Rep.'s Tr. vol. 33, 6660.)  Bove

testified it was a latent not a patent print.  A latent print is "one that you cannot see

without the aid of indirect lighting or fingerprint powder or some other chemicals," while

a patent print is made in a soft material, such as putty or a liquid such as blood.  (Id.)

Bove further testified that although he may have described the print as "bloody" at some

point, the print was not made in blood but was rather a latent print with "some very

minute needlepoint dots of a red substance that appeared to be blood," and which were

"separated from the print, for the most part, by a void."  (Id. at 6671.)  The dots were on

top of the print.  (Id.)  The fingerprint was never identified, but it was preserved and

available for testing until at least 2007.  (Lodgment No. 3, Rep.'s Tr. vol. 8, 1475, Oct. 1,

2007 (Trombetta motion hearing).)  Because it was not destroyed, Jernigan's

Trombetta/Youngblood claim with regard to the fingerprint fails.  The apparent blood

dots were tested by Milton in 2007 and tested presumptively positive for blood.  In one

area, there was insufficient evidence to obtain any DNA.  In a second area, Milton found

one rare allele, which Jernigan possesses.  (Id. vol. 39, 7767.)  Jernigan speculates that if

the blood spots had been better preserved they could have been tested and DNA results

favorable to him could have been obtained.  (ECF No.1, Attach. #8, 135; Lodgment No.

5, Appellant's Opening Brief, People v. Jernigan, No. D060746.)  But as the Supreme

Court stated in Youngblood, when considering a claim that the state failed to preserve

evidence "of which no more can be said than that it could have been subjected to tests," a

criminal defendant must "show bad faith on the part of the police."  Youngblood, 488

U.S. at 57, 58.  Petitioner has not established that police failed to property preserve the

blood on the photo holder in bad faith.

   The same holds true for the murder weapon.  Police initially did not find the knife

used in the murder at the scene.  (Lodgment No. 3, Rep.'s Tr. vol. 33, 6764.)  During the

autopsy, a broken metal tip was found in June George's skull; then, police returned to the

scene and located a knife with a broken tip in a kitchen drawer and they determined that

the knife was the murder weapon.  (Id. at 6791-92, 6757-59; id. vol. 35, 7092-93.)  The

knife was accidentally returned to Fred George in 1988, then retrieved by Chuck Burke shortly thereafter. (Lodgment No. 3, Rep.'s Tr. vol. 45, 10843-44.) The knife was not tested for blood or fingerprints until 2007 when Milton found it tested weakly positive for the presence of blood and minimal DNA. (Lodgment No. 3, Rep.'s Tr. vol. 33, 6730-31; id. vol. 39, 7767.) As with the photo holder, the knife did not have known exculpatory value and was no more than potentially exculpatory. See Youngblood, 488 U.S. at 57; Trombetta, 467 U.S. at 488. Moreover, Jernigan has not shown, as required, that the evidence was destroyed in bad faith. See Youngblood, 488 U.S. at 58.

As to Jernigan's claim regarding the lost copy of his telephone bill, the state appellate court stated as follows:

> We also conclude the court's ruling regarding the alleged missing telephone bill is supported by substantial evidence. First, although the court assumed (for purposes of its ruling) Jernigan had given authorities a copy of his bill, Jernigan made no evidentiary showing it had some exculpatory value known to police so that it should have been preserved, much less that police acted in bad faith by not retaining it. There was no offer of proof that telephone bills in 1986 recorded local calls placed from a telephone, or any claim that any long-distance calls were made during the relevant time frame. Moreover, even if the telephone bill would have shown the telephone had been used during the relevant time frame, the bill would not have shown who was using the telephone in Jernigan's apartment. Finally, a record showing some telephone calls made from the apartment would not necessarily have been inconsistent with Jernigan committing the murder, because the precise time of the murder within the time frame was unknown, and there was no evidence that Jernigan's apartment was too far from June's home to allow him to return home and place calls.
>
> More importantly, Jernigan's Trombetta motion asserted he gave police a copy of his telephone bill, not that he gave them the original bill and was left without a copy thereof. In People v. Velasco (2011) 194 Cal.App.4th 1258, the defendant was convicted of possessing a weapon while in penal custody, which weapon was discovered to be secreted in a pocket sewn into his boxer shorts. (Id. at pp. 126-1261.) Prison personnel did not preserve the shorts as evidence, and they did not photograph them, but instead let defendant continue to wear them. (Ibid.)

He argued this failure to gather and/or preserve the evidence violated Trombetta.  Rejecting that argument, Velasco observed:

> "In such circumstances, we doubt that any due process violated can occur.  'Due process requires the state preserve evidence in its possession where it is reasonable to expect the evidence would play a significant role in the defense.' [(People v. Alexander (2010) 49 Cal.4th 846, 878 [emphasis] added by Velasco.)]  There is no evidence that the state ever possessed the shorts.  It is axiomatic that the constitutional due process guaranty is a bulwark against improper state action.  '[T]he core purpose of procedural due process [is] ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.'  [Citation.]  If the state took no action, due process is not a consideration, because there is no 'loss of evidence attributable to the Government.' [(Youngblood, at p. 57.)]  The state 'might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial.' [(Trombetta, supra.)]  When, however, defendants are allowed to keep evidence for themselves, there is no exercise of any sovereign power and no due process violation.  [¶]  A contrary rule would make the state a caretaker for defendants' exculpatory evidence even though the state did not control or possess the evidence.  Such a rule would make no sense. . . .  Everything in the record points to defendant's continued retention of the shorts that he asserts might constitute exculpatory evidence.  The state has not stopped him from using them to exculpate himself if they are exculpatory."  (Id. at p. 1263, italics added.)

We agree with Velasco that, if the state has not by its conduct deprived a defendant of allegedly exculpatory evidence, a defendant cannot assert a denial of due process merely because evidence over which he originally had (and retained) actual dominion was not thereafter warehoused by the state for his benefit.

As a general matter, due process does not require the police to collect particular items of evidence (People v. Frye (1998) 18 Cal.4th 894, 943, disapproved of on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22), and California cases have uniformly rejected

due process claims based on a failure to collect evidence. (See, e.g., <u>Frye</u>, at p. 943 [no duty to collect additional bloodstains and other items at crime scene]; <u>People v. Daniels</u> (1991) 52 Cal.3d 815, 855 [no duty to perform gunshot residue test on witness]; <u>People v. Farmer</u> (1989) 47 Cal.3d 888, 911 [no duty to take "more and better photographs" of footprints], disapproved of on other grounds in <u>People v. Waidla</u> (2000) 22 Cal.4th 690, 724, fn. 6; <u>People v. Hogan</u> (1982) 31 Cal.3d 815, 851 [no duty to collect scrapings form victim's fingernails], disapproved of on another ground in <u>People v. Cooper</u> (1991) 53 Cal.3d 771, 836; <u>People v. Bradley</u> (1984) 159 Cal.App.3d 399, 405-406 [no duty to collect bloodstains].) In each of those cases, even though the defendant lost evidence <u>solely</u> because of state inaction, there was no due process violation. Here, Jernigan's "lost" evidence was <u>not</u> attributable to solely to state action or inaction, providing even fewer grounds for concluding his due process rights were offended.

(Lodgment 7, <u>People v. Jernigan</u>, D060746, slip op. at 19-21.)

With regard to the telephone bill, the state court's decision was also neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. <u>See</u> 28 U.S.C.A. § 2254(d)(1). The only evidence that Jernigan gave a copy of his telephone bill to police in 1986 was Jernigan's own statements. As the state court noted, no evidence was presented that the telephone bill, assuming it existed, was known by the police to be exculpatory. The bill did not establish that <u>Petitioner</u> made the calls from his home, nor was there any evidence presented that the times of calls made from Jernigan's home coincided with the time of the murder. In addition, Petitioner has not provided sufficient evidence that the copy of the telephone bill he claims he gave to police was the sole copy of the telephone bill, or that police acted in bad faith by failing to preserve the bill.

Jernigan has not established law enforcement destroyed or failed to preserve exculpatory evidence in bad faith, and thus there was no violation of <u>Trombetta</u> or <u>Youngblood</u> and no due process violation. The state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court

/ / /

law.  See 28 U.S.C.A. § 2254(d)(1).  Nor was it based on an unreasonable determination of the facts.  See id.(d)(2).  Jernigan is not entitled to relief as to these claims.

### 5.  **Third-Party Culpability Evidence**

In section nine, ground one, Jernigan contends the trial court erred when it barred him from presenting evidence of third-party culpability for June George's murder.  (ECF No. 1, Attach. #8, 135; Lodgment No. 5, Appellant's Opening Brief at 85-106, People v. Jernigan, No. D060746.)  Respondent does not address this claim in the Answer.

In his direct appeal, Jernigan raised this argument in the petition for review he filed in the California Supreme Court as to four potential suspects.  (Lodgment No. 8, Petition for Review, People v. Jernigan, No. [S215964].)  The state supreme court denied the petition without citation of authority.  (Lodgment No. 9, People v. Jernigan, No. S215964, order at 1.)  This Court must therefore "look through" to the state appellate court's decision addressing this ground for relief and determine whether the denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Ylst, 502 U.S. at 805-06.  The state appellate court denied the claim as follows:

> The trial court ruled on Jernigan's motions to admit third party culpability evidence based solely on the written offers of proof submitted by him as to each potential third party, and the written rebuttal filed by the prosecution in opposition to these offers of proof.  Our evaluation of whether the trial court's rulings were an abuse of discretion is limited to the showing made in connection with Jernigan's motions.

> Glazebrook

> The offer of proof as to Jernigan's proposed suspect, Gerald Glazebrook, claimed Glazebrook dated a friend of June's (Ms. Knight) and quickly became infatuated with Knight, pursuing her despite her efforts to break things off; Knight believed Glazebrook became romantically interested in June immediately after meeting her; he discussed knives with June; he sent her gifts and stalked her, making June uncomfortable; Glazebrook's infatuation with June was because June physically resembled Glazebrook's ex-wife, who had been the victim of

an unsolved knife attack by a masked assailant; police identified Glazebrook as a suspect in June's attack; and Glazebrook had provided a "false alibi" and refused to cooperate with police.

In opposition, the prosecution argued (with evidentiary support from an investigator's report of his interviews with Knight and Glazebrook) Glazebrook was not romantically interested in June; he briefly discussed knives with June at a party because he worked for Buck Knives; and he had a chance encounter with June at a local shopping mall but was not stalking her. Regarding the unsolved knife attack on Glazebrook's ex-wife, the evidence was that the attacker was unmasked and, according to his ex-wife, Glazebrook was never a suspect and the idea that he was a suspect in her attack was "absurd." Regarding his alleged noncooperation with police, Glazebrook <u>did</u> cooperate by giving them fingerprints and providing receipts for the time period, and he only ceased cooperating when he declined to give them a second set of prints (since he had already given his prints) and declined (on the advice of counsel) to take a polygraph. Regarding his alleged "false alibi," the prosecution argued Glazebrook had provided receipts from stores he claimed to have been at during the time of the murder and, moreover, Glazebrook's neighbor recalled seeing him arrive home on the afternoon of the murder and that he looked and acted normally and displayed no injuries or blood on him at that time.

The trial court denied the motion as to Glazebrook because it found "[t]here's nothing there," other than that police tried to "paint him as a strange person" and that Glazebrook had "speculated as to Buck Knives," for whom he worked. Jernigan argues the ruling was an abuse of discretion because Glazebrook's tender of a "false alibi" could permit an inference of consciousness of guilt. His account of his movements was that he went to a bank in Santee between 1:00 and 1:15 p.m., to a lamp store in La Mesa around 2:30 p.m., and went to a blueprint shop in La Mesa around 3:00 p.m., and then returned home. The only evidence of "falsity" was that, in an affidavit in 1987 seeking a warrant to retake Glazebrook's fingerprints, the affiant declared that employees at the lamp store told police they had "never saw him before." The fact some employees could not <u>recall</u> Glazebrook's presence in a store is not proof of a "false alibi." Moreover, there was some evidence that Glazebrook <u>had</u> been at the lamp store (at least at some point in time) because he described an employee who waited on him and that employee (Ms. Allred) apparently testified (in a later civil deposition) that she recalled seeing him in the store as he originally claimed. Moreover police verified

he <u>was</u> at the blueprint shop by 3:00 p.m., apparently unmarked and unbloodied, despite Jernigan's theory that Glazebrook had murdered June in the prior 90-minute window. The alibi was merely <u>uncorroborated</u>, and then as to only <u>one</u> of the mentioned stores, and the lack of corroboration of his whereabouts is not sufficient proof to require admission of the third party culpability evidence. (*People v. Pride*, *supra*, 3 Cal.4th 195, 238.) The trial court's ruling as to Glazebrook was not an abuse of discretion.

Jose Peraza

The offer of proof as to Jernigan's next proposed suspect, Jose Peraza, claimed that one day after June's murder Peraza was apprehended after he (along with an accomplice who was not apprehended) committed a daytime burglary in the vicinity of June's home. The stolen car Peraza was driving at the time he was apprehended contained a bloody shirt and had blood on the floor and the passenger door. Jernigan's offer of proof also claimed two other facts tied Peraza to the actual murder, but neither "fact" withstood scrutiny. First, Jernigan claimed the stolen car Peraza was driving resembled a car a witness spotted in the alley adjacent to June's home around 1:30 p.m. on the day she was killed, and the same witness heard a scream approximately 15 to 20 minutes later. However, <u>neither</u> the time frame <u>nor</u> the alleged match between vehicles was supported by the offer of proof. The offer of proof relied on the statement of a witness that he arrived to work near June's home around 11:30 a.m. and heard a female scream about 15 minutes later, more than two hours before June arrived home. Moreover, the witness's statement described the car he saw as a "dark blue or dark green Buick Regal or similar vehicle, with a full chrome front end and four rectangular headlights . . . [and] thinks [it] had a padded vinyl roof, 'because it stuck up a little bit.'" Although this description could have matched June's "<u>dark blue</u> Pontiac Grand Prix, with a chrome grill, four rectangular headlamps, and a half length padded vinyl roof" (italics added), the stolen car driven by Peraza was a 1976 <u>bronze colored</u> Grand Prix. Jernigan's offer of proof also claimed Peraza "made repeated statements on the night [of the murder] that he had some problems in the day with a [woman] who came home and he had to stab her," but the prosecution's opposition below pointed out this hearsay statement was unsupported by any suggestion of what admissible evidence would be produced to support this claimed "fact." Jernigan did not argue this point at the hearing on the motion, and on appeal has abandoned any reliance on this alleged statement.

In opposition, the prosecution argued tests excluded June as the source of the bloodstains on the shirt and in the car, and no DNA from Peraza [had] been linked to the site of the homicide. The prosecution argued the only basis for Jernigan's argument was that (1) Peraza had "opportunity" and (2) Peraza's daytime burglary in the same general area went beyond "propensity" evidence and was admissible because it involved a similar "modus operandi." The prosecution argued exclusion of similar third party culpability evidence was upheld in People v. Von Villas (1992) 10 Cal.App.4th 201, in which, although the two robberies occurred in the same general area and involved the same type of establishment, the modus operandi were very different between the two robberies. (Id. at pp. 265-267.) The prosecution argued the modus operandi here were completely different, in that (1) Peraza's burglary involved forced entry into the home using a screwdriver and no forced entry was used in June's home, and (2) Peraza fled his burglary when a surprise confrontation with a witness occurred whereas the defense theory necessarily posited he did not flee (but instead stabbed June) when similarly surprised by a witness.

The trial court rejected Jernigan's motion as to Peraza as "speculative and remote." Because the only evidence implicating Peraza was that he was apprehended after he committed another daytime burglary in the vicinity of June's home, the evidence at most showed "opportunity," and the denial of the motion as to Peraza was not an abuse of discretion. (Accord, People v. Lewis, supra, 26 Cal.4th at p. 372-373 [propensity evidence without more does not satisfy admissibility standards of Hall]; Hall, supra, 41 Cal.3d at pp. 833 ["mere . . . opportunity to commit the crime . . . , without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."]

Christopher Peterson

The offer of proof as to Jernigan's proposed suspect, Christopher Peterson, claimed Peterson was Kathy's ex-boyfriend who had (1) motive (because he was angry that June induced Kathy to break off the relationship with Peterson), (2) had been violent towards June (because he slapped June on one occasion after she called him a "faggot"), and (3) had fabricated an alibi about taking a military entrance exam in Fresno from 9:00 a.m. to noon on the day of the murder.

In opposition, the prosecution noted most of the allegations against Peterson were unsupported by any proffer of corroborating evidence. Indeed, the prosecution noted Jernigan's own documents filed in support of the false alibi claim included a document stating "[t]here is military paperwork showing PETERSON took a Navy entrance written examination in Merced, California, on the day of the murder." The prosecution also submitted a military DD form 1966/4 (initialed by Peterson) establishing he took the exam as he claimed, and provided evidence that the person who signed the form on behalf of the military confirmed Peterson's alibi to police.

The trial court denied the motion as to Peterson. Because there was minimal evidence of motive, no direct or circumstantial evidence linking him to the actual perpetration of the crime evidence of opportunity, and affirmative evidence of <u>lack</u> of opportunity, the ruling was not an abuse of discretion.

Dale Wallenius

Jernigan's offer of proof as to his alternative suspect, Dale Wallenius, was that (1) Wallenius had been June's employer and may have stood to benefit from life insurance covering June, (2) June did not like Wallenius, (3) after Wallenius broke up with June's friend (Elaine), June introduced Elaine to another man, (4) Elaine said someone named "Judy" saw Wallenius driving his car on a freeway near June's home on the afternoon of the murder, and (5) Wallenius gave a "false alibi" because he left work "early" on the day of the murder to go out of town with his then-girlfriend, but the girlfriend called Judy Pierce around 2:30 p.m. and told her Wallenius had not yet arrived.

The prosecution opposed the proffer as to Wallenius by asserting (1) there was no evidence of motive because there was no evidence Wallenius was a beneficiary of any life insurance policy on June's life (or had ever collected any insurance proceeds) and Elaine told police June had no involvement in her decision to break up with Wallenius, (2) there was no evidence of false alibi because Wallenius told police he went with his girlfriend to Idyllwild on the day of the murder and that girlfriend confirmed to police they had gone to Idyllwild that day and arrived while it was still light outside. The prosecutor also noted at oral argument that, as to motive, there was no evidence Wallenius stood to reap any financial gain from her death, and the alternative motive posited by the defense (i.e.

72

his alleged anger at June for her role in alienating Elaine from Wallenius) was undercut by the fact he was already romantically involved with a new woman (whom he eventually married) with whom he went out of town that afternoon.

The court found "[t]here's not enough there" and denied the motion as to Wallenius. We reiterate that, under <u>Hall</u>, proof of "mere motive or opportunity to commit the crime . . . , without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the <u>actual perpetration</u> of the crime." (<u>Hall</u>, <u>supra</u>, 41 Cal.3d at pp. 833, italics added.) Merely showing Wallenius was still in town, thus providing him opportunity, is not enough. Nor was the alleged fact that he might have had a financial motive sufficient. (<u>People v. Pride</u>, <u>supra</u>, 3 Cal.4th at p. 238 [absent other evidence linking person to actual perpetration of crime, proof that person was beneficiary of life insurance is not sufficient under <u>Hall</u>].) The trial court's ruling was not an abuse of discretion.

(Lodgment No. 7, <u>People v. Jernigan</u>, D060746, slip op at 34-41.)

The exclusion of defense evidence can violate a defendant's due process right to a fair trial under certain circumstances. The Supreme Court has described the principles governing this claim:

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,' " <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)), but we have also recognized that " 'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials,' " <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting <u>United States v. Scheffer</u>, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. <u>See</u> 547 U.S., at 331, 126 S.Ct. 1727 (rule did not rationally serve any discernible purpose); <u>Rock v. Arkansas</u>, 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (rule arbitrary); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302–303, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (State did not even attempt to explain the reason for its rule); <u>Washington v. Texas</u>, 388 U.S. 14, 22, 87

S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (rule could not be rationally defended).

Nevada v. Jackson, __ U.S. __, __, 133 S. Ct. 1990, 1992 (2013).

The Supreme Court has acknowledged that rules governing the introduction of evidence of a third party's culpability for a crime are "widely accepted" and among the "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. at 326, 327 (citations omitted). In order for evidence of third-party culpability to be admissible in California, it must be "capable of raising a reasonable doubt as to [the defendant's] guilt of the charged crime." People v. Mackey, 233 Cal. App. 4th 32, 110, 182 Cal. Rptr. 3d 401, 465 (2015). "[E]vidence of [another person's] mere motive or opportunity to commit the crime . . . , without more, will not suffice; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." Id. at 110-11 (citing People v. Elliott, 53 Cal. 4th 535, 580, 137 Cal. Rptr. 3d 59, 269 P.3d 494 (2012); People v. Hall, 41 Cal. 3d 826, 832-33, 226 Cal. Rptr. 112, 116, 718 P.2d 99, 103 (1986)).

The appellate court's conclusion that there was insufficient evidence to permit the introduction of third-party culpability evidence with regard to Glazebrook, Peraza, Peterson, and Wallenius was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. See 28 U.S.C.A. § 2254(d)(1). In support of the opposition to the motion to admit the third-party evidence, the prosecution provided interviews with Wallenius; his ex-wife Rena Wallenius; Elaine Knight, a friend of June George's who dated Glazebrook; Glazebrook himself; Glazebrook's ex-wife Cynthia Silver; and Gerald Frye, who signed Peterson's navy classification papers. (Lodgment No. 1, Clerk's Tr. vol. 5, 1102-25 (investigator's reports), 1155-58 (investigator's report).) These interviews established, as the state court noted, that most of the defense allegations with regard to Glazebrook, Peraza, Peterson, and Wallenius were either untrue or speculation.

In their opposition to the defense motion to present evidence of third-party culpability, the prosecution established Peterson was taking a military entrance exam in Fresno, California until 12:00 p.m. the day of the murder and was too far away to travel to La Mesa in time to murder June George. (Lodgment No. 1, Clerk's Tr. vol. 5, 1155-58.) In addition, Peterson was excluded as a DNA contributor to the purse stain. (ECF No. 1, Attach. # 3, 81.)[8] The trial court correctly concluded there was "no competent or substantial evidence" to show Peterson was guilty of the murder, nor was there any evidence of animosity between Peterson and June George. (Lodgment No. 3, Rep.'s Tr. vol. 24, 4529, May 7, 2010.)

As to Glazebrook, the prosecution established through interviews with Glazebrook, Glazebrook's ex-wife, and Elaine Knight, that none of the allegations regarding Glazebrook's alleged obsession with June George were true, and Glazebrook was never a suspect in the knife attack on his ex-wife because the attacker did not cover his face. (Lodgment No. 1, Clerk's Tr. vol. 5, 1111-29 (investigator's reports).) While a portion of Glazebrook's alibi was uncorroborated, no physical evidence tied him to the murder scene, and he was excluded as a DNA contributor to the stains on the tissue, bedspread, towel, and eyeglass case. (ECF No. 1, Attach. #3, 82-84.) The trial judge correctly noted that although Glazebrook "demonstrated a certain fascination and speculation as to Buck Knives," and the police "did their level best to paint him as a strange person," there ultimately was "nothing there." (Lodgment No. 3, Rep.'s Tr. vol. 24, 4532.)

There also was insufficient evidence as to Wallenius. The allegation made by the defense that Wallenius stood to benefit from a life insurance policy did not prove to be true, nor did the suggestion that Wallenius was upset with June for his breakup with Elaine Knight. (Lodgment No. 1, Clerk's Tr. vol. 5, 1103-08 (investigator's reports).)

---

[8] Milton's 2004 DNA testing excluded "Christopher Alexander" from the purse stain. (ECF No. 1, Attach. #3, 78-88.) Peterson has also been referred to as "Christopher Alexander." (Lodgment No. 1, Clerk's Tr. vol. 6, 1230.)

Both he and Knight confirmed they were travelling to Idyllwild on the day of the murder. (Id.)

The defense also argued Peraza was a suspect in June George's murder because he was burglarizing a home near the murder scene a day after June George's murder. (Lodgment No. 1, Clerk's Tr. vol. 5, 1017-19.) The prosecution established, however, that the burglary Peraza committed was dissimilar to the burglary of June George's home. The alleged burglary in June George's murder did not involve forced entry; the prosecution argued that when confronted by June George, the burglar murdered her.[9] In contrast, the prosecution maintained that the burglary committed by Peraza involved forced entry and when he was confronted, Peraza ran away. (Id. at 1090.) In addition, Peraza was excluded from the DNA found on the purse stain. (ECF No. 1, Attach. #3, 79-81.) The appellate court reasonably concluded the evidence supporting third party culpability as to Peraza was "speculative and remote."

The appellate court carefully considered the reasons the trial court gave for excluding the evidence as to each individual and agreed the evidence suggesting any of the four individuals had committed the murder was insufficient. As to Glazebrook, Peterson, and Wallenius, there was no evidence of motive or opportunity to commit the murder, or any other evidence linking them to the scene. As to Peraza, while there was opportunity and possibly motive, that alone is not sufficient to warrant introduction of third-party liability evidence under California law. See Mackey, 233 Cal. App. 4th at 110-11, 182 Cal. Rptr. 2d at 465. The state court's decision to exclude evidence of third-party liability was a routine exercise of discretion under state law and does not rise to the level of a due process violation. Accordingly, the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court

---

[9] One of the prosecution's theories of the murder, and on which the jury was instructed, was that the murder was committed during the commission or attempted commission of a burglary. (Lodgment No. 1, Clerk's Tr. vol. 9, 2042-44 (jury instructions).)

15cv2793 BTM (RBB)

law.  See 28 U.S.C.A. § 2254(d)(1).  Nor was it based on an unreasonable determination of the facts.  See id.(d)(2).  Jernigan is not entitled to relief as to this claim.

### 6. **Pre-charging Delay**

Jernigan contends in section nine, ground three, that delay in charging him with June George's murder denied him due process rights.  (ECF No. 1, Attach. #8, 135-36; Lodgment No. 5, Appellant's Opening Brief, People v. Jernigan, No. D060746.)  Specifically, he claims the delay in charging him resulted in the loss of witnesses and evidence that would have helped his defense, and that there was insufficient justification for the delay.  (Id.)  Respondent has not addressed this claim.

Petitioner raised this claim in the petition for review he filed in the California Supreme Court, which denied the petition without citation of authority.  (Lodgment No. 8, Petition for Review at 17-24, People v. Jernigan, [No. S215964].)  Once again, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  On appeal, Jernigan alleged he was prejudiced by the loss of a witness who saw him in the laundry room of his apartment complex on the afternoon of the murder and the loss of a copy of his telephone bill, both of which could have corroborated his alibi.  (Lodgment No. 5, Appellant's Opening Brief at 44-47, 79-84, People v. Jernigan, No. D060746.)  He also claims he was prejudiced by the failure to collect certain items of physical evidence and by the improper storage of other pieces of evidence which could have been tested if properly stored, and by the death of Officer Burke.  (Id. at 46, 67-72.)  The state appellate court, citing the applicable United States Supreme Court and California law consistent with federal law, addressed Jernigan's claim at length:

> Jernigan argues the trial court abused its discretion because it erred in concluding he had not demonstrated significant prejudice from the delay, and in concluding there was substantial justification for the delay. We are not persuaded by either argument.
>
> First, Jernigan argues on appeal he demonstrated significant prejudice from the delay because the person who purportedly saw him in

the laundry room was not able to be located, and Jernigan did not keep his telephone bill, and these undermined his ability to buttress his alibi defense and permitted the prosecutor to suggest his alibi was a fictional creation. However, substantial evidence supports the court's finding that Jernigan did not prove the telephone bill was "lost" by police, and nothing about the delay prevented him from retaining a document he presumably knew (from the purported fact he made a special trip to deliver it to police) [FN 4] represented significant evidence of his innocence.

> [FN 4: Jernigan testified Burke asked him, during telephone conversations in 1986, for a copy of his telephone bill to verify he was on the telephone on the afternoon of the murder, and he took a copy of the bill to Burke when it arrived.]

(Cf. People v. Cowan, supra, 50 Cal.4th at p. 432 [rejecting claim of prejudice from lost evidence and alibi witnesses caused by delayed prosecution where defendant knows he is a suspect in homicide because he had "an incentive to record any exculpatory information he had regarding his whereabouts … or the identity of alibi witnesses"].) Additionally, substantial evidence supports the court's finding the telephone bill was of marginal value to buttressing Jernigan's alibi defense, and any harm from the loss of that bill was speculative. [FN 5]

> [FN 5: The evidence showed the murder occurred sometime during an almost three-hour window. Although Jernigan suggests there was evidence pinpointing the time of the murder, based on a termite control employee working near June's home who heard a female scream around 1:45 p.m., Jernigan's evidence for that assertion relies solely on a police report in which the employee reported he arrived at the job near June's home around 11:30 a.m. and heard a female scream about 15 minutes later. This scream would have been almost two hours before June arrived home. Because the precise time of the murder remains uncertain, a bill containing only a few entries of calls would not necessarily have been inconsistent with Jernigan's committing the crime because it would not show who was using the telephone, nor would it show (absent entries covering the almost three-hour window) Jernigan was home during the entire three-hour period.]

Jernigan's inability to locate the bill did not cause significant prejudice to him. Regarding the lost ability to locate the laundry room witness, there was again substantial evidence to support the court's finding Jernigan had not shown significant prejudice as a result of the inability to locate this alleged witness because the time of death was uncertain (and therefore the laundry room witness's sporadic encounters with Jernigan would not have provided him with an alibi for the majority of the afternoon in which the victim was slain), and the person he encountered in the laundry room was a stranger to him and it is therefore speculative the witness would have known or remembered his presence that day. He also asserts on appeal that, because Burke died during the delay, Jernigan was deprived of the ability to show (through Burke's testimony) that the proffered alibi was not a recent concoction. However, Jernigan had some evidence (e.g. the transcript of the 1994 interview) that the laundry room witness claim had been earlier proffered. Indeed, even had Burke been able to testify, it appears he would have confirmed Jernigan made the laundry room witness claim but would <u>also</u> have testified Burke <u>disbelieved</u> Jernigan's claim about the laundry room witness because he had learned Jernigan had told other people he was at a friend's house at the time of the murder.

Jernigan also argues on appeal that he demonstrated significant prejudice from the delay because the blood evidence on the knife used to kill June had deteriorated to the extent that DNA testing of that evidence was no longer viable. However, there is substantial evidence to support the court's findings that Jernigan did not show, had charges been filed sooner or the knife preserved differently, DNA evidence could have been extracted from the blood on the knife. Sheriff's criminalist Merritt testified DNA testing was not available to the sheriff's department in 1986; criminalist Spurgeon testified that DNA testing techniques in the mid-1990's required "[m]uch more" of the sample; and criminalist Milton testified it could have been detrimental (even in the mid-1990's) to have tried to test the knife for DNA because the technology "at that time was pretty limited" and testing could have "consumed [the sample] with little or no information obtained by the testing available at that time."

Against this speculative prejudice, the trial court found the delay was not the result either of a purposeful effort to obtain a tactical advantage or of a negligent investigation, but was instead attributable to "investigative delay." There was substantial evidence to support the latter conclusion. The court found, and the evidence supports the finding, that scientific testing available at the time of the murder produced "insufficient

evidence to determine precisely who the murderer was," and the evidence showed another person (Gerald Glazebrook) was still a primary suspect as late as 2001. The court found that it was only because evolving scientific techniques allowed a retest of the evidence starting in 2001 that police eventually determined sufficient evidence pointed to Jernigan as the murderer.

Jernigan does not claim on appeal that the evidence compelled a different finding. He does not suggest that the evidence conclusively showed testing capabilities available to authorities in 1986 would, if employed, have yielded sufficient DNA evidence showing Jernigan was [not] the murderer. Instead, he appears only to argue that later technologies (such as early PCR testing, which was starting to be developed in the late 1980's) might have produced sufficient evidence if those were employed as they became available, thereby reducing the delay in prosecuting him. However, a similar argument was rejected in Nelson, supra, 43 Cal.4th at pages 1256–1257, in which the court observed, "Defendant argues that the DNA technology used here existed years before law enforcement agencies made the comparison in this case and that, therefore, the comparison could have, and should have, been made sooner than it actually was. Thus, he argues, the state's failure to make the comparison until 2002 was negligent. We disagree. A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. '[T]he necessity of allocating prosecutorial resources may cause delays valid under the Lovasco analysis. [Citation.] Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." The court concluded the delay was solely based on investigative delay and that this legitimate basis for delay was sufficient justification to overcome the alleged prejudice Jernigan might suffer.

Here, "the justification for the delay was strong [and was] investigative delay, nothing else. The police may have had some basis to suspect defendant of the crime shortly after it was committed . . . . But law enforcement agencies did not fully solve this case until . . . a comparison of defendant's DNA with the crime scene evidence resulted in a match, i.e., until the cold hit showed that the evidence came from

defendant. Only at that point did the prosecution believe it had sufficient evidence to charge defendant. A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges. 'The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment . . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt . . . . Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' [(<u>People v. Dunn-Gonzalez</u> (1996) 47 Cal.App.4th 899, 914–915; citations).]" (<u>Nelson</u>, <u>supra</u>, 43 Cal.4th at p. 1256.) We believe this reasoning is controlling and therefore conclude the trial court did not abuse its discretion when it denied Jernigan's motion to dismiss for precharging delay.

(Lodgment No. 7, <u>People v. Jernigan</u>, D060746, slip op. at 28-33.)

In <u>United States v. Lovasco</u>, the Supreme Court stated that "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee, against bringing overly stale criminal charges." 431 U.S. 783, 789 (1977) (citation and internal quotation marks omitted). <u>Lovasco</u> also indicated, however, that "the statute of limitations does not fully define (defendants') rights with respect to the events occurring prior to indictment and that the Due Process Clause has a limited role to play in protecting against oppressive delay." <u>Id.</u> (internal citation and quotation marks omitted). The Ninth Circuit has described the due process analysis of a claim of pre-complaint delay as follows:

In order to succeed on [a] claim that he was denied due process because of pre-indictment delay, [a defendant] must satisfy both prongs of a two-part test. First, he must prove "actual, non-speculative prejudice from the delay." <u>Huntley</u>, 976 F.2d at 1290. Second, the length of the delay is weighed against the reasons for the delay, and [a defendant] must show

that the delay "offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' " Sherlock, 962 F.2d at 1353-54 (quoting United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)). The second prong of the test applies only if [a defendant] has demonstrated actual prejudice. Barken, 412 F.3d at 1136. We have held that establishing prejudice is a "heavy burden" that is rarely met. Huntley, 976 F.2d at 1290. "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice." United States v. Manning, 56 F.3d 1188, 1194 (9th Cir. 1995). Consequently, [a defendant] must show both that lost testimony, witnesses, or evidence "meaningfully has impaired his ability to defend himself," and "[t]he proof must demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to [his] case." Huntley, 976 F.2d at 1290.

United States v. Corona-Verbera, 509 F.3d 1105, 1112 (9th Cir. 2007).

Jernigan contends that as a result of the delay in charging him, he lost defense evidence, specifically: (1) his telephone bill, (2) DNA evidence on the murder weapon, and (3) evidence from Detective Burke that would have corroborated his alibi. (ECF No. 1, Attach. #8, 135-36; Lodgment No. 5, Appellant's Opening Brief at 46, 67-72, People v. Jernigan, No. D060746.) Petitioner has not established prejudice with regard to the DNA evidence. As noted above, Jernigan must establish "actual, non-speculative prejudice from the delay." Corona-Verbera, 509 F.3d at 1112. Milton testified that in 2008, she tested the knife for DNA and obtained only a minimal amount. (Lodgment No. 3, Rep.'s Tr. vol. 39, 7767.) Jernigan contends that had the knife been properly stored, DNA testing could have provided exonerating evidence. This assertion is speculative as there is no evidence establishing either that proper storage would have enabled DNA to be extracted from the knife or that the DNA would have helped exonerate Jernigan.

Jernigan also argues the delay in prosecution resulted in losing his telephone bill and testimony by Burke who had died by the time of trial. Petitioner claims Burke could have provided testimony and evidence that corroborated his alibi. The murder occurred sometime between 2:00 p.m. and 5:20 p.m. on August 8, 1986. (Lodgment No. 7, People v. Jernigan, No. D060746, slip op. at 5.) At the hearing on the motion to dismiss for pre-

charging delay, Jernigan testified that Burke interviewed him several times after the murder, and he told Burke he was doing laundry and talking on the phone the afternoon of August 8, 1986. (Lodgment No. 4, Rep.'s Tr. vol. 2, 53-54, Jan. 2, 2008.) He claims he also told Burke another resident of the apartment complex was in the laundry room and could corroborate his presence and that he gave Burke a copy of his telephone bill. (Id.) Investigator Howard testified Burke never mentioned the laundry-room witness or the telephone bill when Howard interviewed Burke about the case in January of 2005. (Id. at 138, 140-44.) Further, there is no mention in any of the police reports or other documents of the telephone bill Jernigan allegedly gave to Burke, or any visits by Burke to Jernigan's apartment complex to interview the laundry-room witness. (Lodgment No. 3, Rep.'s Tr. vol. 45, 10899, 10901-02, 10907-09.) Jernigan's claims amount to "'[g]eneralized assertions of the loss of memory, witnesses or evidence,'" Corona-Verbera, 509 F.3d at 1112 (citation omitted), and are therefore insufficient to establish prejudice.

Because Jernigan has not demonstrated that he suffered actual, non-speculative prejudice from the pre-complaint delay, the Court need not proceed to analyze the reasons for the delay. See id. But even if Petitioner had established sufficient prejudice to proceed to the second prong of this analysis, the delay did not "offend[ ] those fundamental conceptions of justice which lie at the base of our civil and political institutions." Id. (citation and internal quotation marks omitted). The Supreme Court has discussed the analysis which should be employed in balancing any prejudice suffered by a defendant with the reasons for delay:

> [T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." Rochin v. California, 342 U.S. 165, 170, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Our task is more circumscribed. We are to determine only whether the action complained of here, compelling

83

respondent to stand trial after the Government delayed indictment to investigate further violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), and which define "the community's sense of fair play and decency," Rochin v. California, supra, 342 U.S. at 173, 72 S.Ct. at 210. See also Ham v. South Carolina, 409 U.S. 524, 526, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973); Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941); Hebert v. Louisiana, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926); Hurtado v. California, 110 U.S. 516, 535, 4 S.Ct. 111, 120, 28 L.Ed. 232 (1884).

. . . .

In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," United States v. Marion, 404 U.S. at 324, 92 S.Ct., at 465, precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," Smith v. United States, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959). This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

Lovasco, 431 U.S. at 790, 795-96 (footnoted omitted).

In Jernigan's case, the state trial court examined the reasons for the prosecutorial delay in a lengthy hearing. (See Supp. Lodgment No. 1, Rep.'s Tr. Mot. Proceedings; Supp. Lodgment No. 2, Rep.'s Tr., Jan. 10, 2008; Lodgment No. 3, Rep.'s Tr. vol. 10, 1988-2009.) At that hearing, and citing Lovasco, the trial judge determined that the delay in charging Jernigan was due to advancements in DNA testing procedures and not an attempt to gain a tactical advantage over Jernigan:

/ / /

[THE COURT]: In this particular case, I resolve it finding there is no federal due process right violation, because I don't find that the 20-year delay in bringing this matter to court to have been done for the purpose of gaining a tactical advantage over the defendant.

The delay in this case has hurt, in my opinion, the prosecution in that the items they might want for a murder prosecution may have been lost. They may have been contaminated. And I say "may," because I don't know that necessarily at this time the evidence is conclusive in that regard.

Witnesses that might have assisted them in this prosecution, Detective Burke, has passed away, and perhaps others, including Mr. George.

It does appear to me the police legitimately were unable to determine at that time who the assailant was when the murder occurred.

I do think there have been advancements in science, and especially with respect to DNA, including quantification that now make the people able to link the defendant to the murder scene, based on the information known to the police when the murder occurred, caused the murder to remain unsolved.

The fact that the prosecution has not determined they have sufficient evidence to prosecute Mr. Jernigan is not based on some bad faith action on their part based on the state of the evidence, as I see it.

And since there is no bad faith showing, the defense cannot show that the federal due process rights of Mr. Jernigan have been violated by the delay in prosecuting this case.

(Lodgment No. 3, Rep.'s Tr. vol. 10, 1990-91.)

Both the trial court's and the appellate court's conclusions are supported by the record. The initial investigation of the murder and murder scene did not reveal any solid evidence pointing to a suspect. Detective Lee, one of the first officers on the scene, testified there was no forced entry. (Lodgment No. 3, Rep.'s Tr. vol. 32, 6592-93.) Detective Quinn interviewed Kathy Keller and Jernigan the night of the murder. He

learned from Keller that she had recently broken up with Jernigan.  (Lodgment No. 3, Rep.'s Tr. vol. 35, 7082-84.)   Quinn also interviewed Jernigan and did not consider him a suspect, but did take fingerprints from everyone who would have been inside June George's house, including Jernigan.  (Id. at 7088.)  Crime scene investigator Bove collected evidence and fingerprinted the scene, including the photo holder of George's wallet which had a fingerprint and some blood on it.  (Lodgment No. 3, Rep.'s Tr. vol. 33, 6670.)  Despite testing the fingerprint numerous times over the intervening years, the owner of the print was never identified.  (Id. at 6697.)  Merritt tested several blood-stained items of evidence to determine the blood type.  He found the victim's blood type, type B, and at least one other blood type.  (Id. at 6733-48.)  DNA testing was not available to the San Diego Sheriff's Department at that time, and only blood typing was performed on evidence found at the scene.  (Lodgment No. 2, Rep.'s Tr. vol. 2, 170-71, Jan. 4, 2008; Supp. Lodgment No. 1, Rep.'s Tr. Mot. Proceedings 2155.)

District Attorney Investigator David Decker began re-investigating the case in 1994.  (Lodgment No. 3, Rep.'s Tr. vol. 41, 8190, 8195-96.)  He re-interviewed witnesses and family members, including Jernigan.  (Id.)  Jernigan told Decker that he was at home doing laundry on the afternoon of the murder.  (Id. at 8204.)

In 2000, La Mesa Police Sergeant Vince Brown, who was a detective at the time, began looking into the June George cold case.  He worked on the case in his off hours.  (Lodgment No. 1, Rep.'s Tr. vol. 37, 7301-02.)  After locating the evidence from the case and determining that the DOJ would provide free DNA testing, Brown obtained blood from Keller, David George, and Jernigan and sent the serological evidence and blood samples to the DOJ lab in early 2001.  (Id. at 7310-16.)  Colleen Spurgeon began DNA testing on the evidence on June 13, 2002.  The delay in testing was due to a backlog of cases.  (Lodgment No. 3, Rep.'s Tr. vol. 35, 7160.)  She concluded that as to both bedspread stains, the major donor was Jernigan.  (Id. at 7173-75.)

Brown confronted Jernigan with Spurgeon's DNA results during an interview on April 25, 2003.  Jernigan told Brown that he could not think of a reason his blood would

be found on the wallet, bedspread, or in the victim's bedroom. (Lodgment No. 3, Rep.'s Tr. vol. 37, 7328-30.) Brown recommended to the District Attorney's Office that the investigation be reopened. (Id. at 7318.)

In late 2003, Brown submitted a receipt, two business cards, a checkbook, and a purse to the San Diego County Sheriff's Office for DNA testing by Connie Milton. (ECF No. 1, Attach. #3, 79-81.) Milton performed the testing in 2004 but did not obtain any meaningful results. (Id.) Beginning in late 2005, she performed a second round of DNA testing on several other items of evidence, including a tissue, a stain found in the bathroom, a bedspread, a towel, and an eyeglass case. (Id. at 82-87.) Milton confirmed Spurgeon's finding that Jernigan's DNA was present on the bloodstains on the bedspread, towel, and the victim's eyeglass case. (Id. at 84-87.) D.A. Investigator Howard sought and obtained an arrest warrant for Jernigan on February 21, 2006. (ECF No.1, Attach. #2, 2-22.)

It was not until more sensitive DNA testing became available that law enforcement could establish a sufficient connection between the murder and Jernigan. This was due in part to the small amount of serological evidence that existed. Thus, the state court was correct in determining that the delay between the crime and Jernigan's prosecution was because of the ongoing investigation of the murder and the improving DNA testing techniques, not to gain a tactical advantage. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. See 28 U.S.C.A. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts. See id.(d)(2). Jernigan is not entitled to relief because of the pre-charging delay.

### 7. **Failure to Conduct Competency Proceedings**

In section nine, ground four, Jernigan contends his federal due process rights were violated when the trial court refused to hold a competency hearing after counsel expressed doubts about Jernigan's competency and asked for a hearing (ECF No. 1, Attach. #8, 136; Lodgment No. 5, Appellant's Opening Brief at 107-13, People v.

Jernigan, No. D060746, 107-13.)  Respondent does not address this claim in the Answer.

At a pretrial hearing, Jernigan's attorney told the court Petitioner wanted to represent himself.  The attorney was concerned, however, about Jernigan's competency.  (Lodgment No. 4, Rep.'s Tr. vol. 1, 4-5, July 8, 2010.)  Specifically, counsel told the court Jernigan had an "irrational belief system" and had exhibited "irrational conduct" during his representation.  (Id. at 5.)  Counsel also told the court that he had spent "more time talking with [Jernigan] than I ever have in any case I have ever represented somebody in 29 years," but that counsel's explanation of the facts of the case and the law was "not getting through."  (Id.)  Counsel also believed Jernigan's "delusional belief system" was the motivating factor behind his request to represent himself.  (Id. at 7.)  The trial judge did not believe there was sufficient evidence to suspend proceedings, order a competency examination, and thereafter hold a hearing, pursuant to California Penal Code section 1368.[10]  (Id. at 12.)  The trial judge did, however, appoint a psychiatrist to examine Jernigan.  (Id. at 12-13, 26-27.)  A report was submitted to the court, and on July 16, 2011, counsel renewed his motion for a competency hearing. (Lodgment No. 3, Rep.'s Tr. vol. 26, 4575-79, July 16, 2011.)  The trial court denied the renewed motion, noting that the psychiatrist found Jernigan "is a difficult [client] and not particularly cooperative, but that's the end of that issue."  (Id. at 4578.)

Jernigan raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 8, Petition for Review at 24-31, People v. Jernigan, No. [S215964].)  The court denied the petition without the citation of authority, so this Court

_____

[10] California Penal Code section 1368 reads, in pertinent part, as follows:

(b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369.  If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing.  Any hearing shall be held in the superior court.

Cal. Penal Code § 1368(b) (West Supp. 2017).

looks to the California Court of Appeal's opinion denying the claim as the basis for the state court analysis. Citing Drope v. Missouri, 420 U.S. 162, 171-72 (1975), and Dusky v. U.S., 362 U.S. 402 (1960), the state appellate court wrote:

> We conclude the trial court correctly found no substantial basis for ordering a competency hearing. Although defense counsel stated Jernigan lacked the requisite competence, the court itself harbored no doubts (nor apparently did Jernigan) that he was able to understand the nature of the proceedings against him, to consult with counsel, and to assist in preparing a rational defense, and there is an adequate basis for the court's certainty as to his competence. The court was able to observe Jernigan in court, and was entitled to consider the papers he filed, including a letter written just two months earlier in which Jernigan demonstrated he was more than competent, as he showed he understood that contaminants in a "buffer reagent" could have undermined the persuasiveness of Milton's DNA testing. Indeed, in the precise hearing at which Jernigan's claimed incompetence was first interposed, he (1) asserted a quite rational distinction that he wanted to represent himself as cocounsel with existing counsel remaining to assist him, and (2) recognized the need to consult "at length" with his attorney when the court informed him that his "co-counsel" request was unavailable and he would have to choose between representing himself or having existing counsel remain. Moreover, the evaluation of a mental health professional who examined him reinforced the court's opinion that Jernigan, although "a difficult [client] and not particularly cooperative," was competent. Finally, Jernigan demonstrated his understanding of the nature of the proceedings against him, as well as his ability to consult with counsel and to assist in preparing his defense, when he made the rational decision that (having been rebuffed in his effort to become cocounsel) he would withdraw his Faretta motion and would keep his trained counsel. The trial court did not err when it declined to suspend proceedings under section 1368.

(Lodgment No. 7, People v. Jernigan, D060746, slip op. at 46-47.)

The Ninth Circuit has explained the clearly established Supreme Court law regarding competency as follows:

> It is undisputed that "the conviction of an accused person while he is legally incompetent violates due process." Pate [v. Robinson, 383 U.S. 375, 378 (1966)]. To be competent to stand trial, a defendant must have the "capacity to understand the nature and object of the proceedings

against him, to consult with counsel, and to assist in preparing his defense." <u>Drope</u>, 420 U.S. at 171, 95 S.Ct. 896. Where the evidence before the trial court raises a "bona fide doubt" as to a defendant's competence to stand trial, the judge on his own motion must conduct a competency hearing. <u>Pate</u>, 383 U.S. at 385, 86 S.Ct. 836. This responsibility continues throughout trial, <u>Drope</u>, 420 U.S. at 181, 95 S.Ct. 896, and we apply the same bona fide doubt standard to determine whether an additional competency hearing was required. <u>See</u> <u>Amaya-Ruiz v. Stewart</u>, 121 F.3d 486, 489 (9th Cir. 1997). We have explained that under <u>Drope</u> and <u>Pate</u>, the test for such a bona fide doubt is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." <u>de Kaplany v. Enomoto</u>, 540 F.2d 975, 983 (9th Cir. 1976) (en banc). "[Any evidence] of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required," and "one of these factors standing alone may, in some circumstances, be sufficient." <u>Drope</u>, 420 U.S. at 180, 95 S.Ct. 896 (paraphrasing <u>Pate</u>, 383 U.S. at 385, 86 S.Ct. 836).

<u>Maxwell v. Roe</u>, 606 F.3d 561, 568 (9th Cir. 2010).

In evaluating a claim of failure to conduct a competency hearing, "retrospective determinations of incompetence" are "disfavored." <u>See</u> <u>Williams v. Woodford</u>, 384 F.3d 567, 608 (9th Cir. 2004). Only when a court can "conduct a meaningful hearing to evaluate retrospectively the competency of the defendant" should a court undertake such a task. <u>Moran v. Godinez</u>, 57 F.3d 690, 696 (9th Cir. 1995) (citations omitted), <u>overruled on other grounds by</u> <u>Lockyer</u>, 538 U.S. at 75-76; <u>see also</u> <u>Drope</u>, 420 U.S. at 183.

The trial judge in Jernigan's case had ample opportunity to observe Jernigan over the lengthy course of this matter. Judge Exharos presided over Jernigan's case beginning in May of 2010 when he heard a series of pretrial motions before counsel raised the issue of competence on July 8, 2010. (<u>See</u> Lodgment No. 4, Rep.'s Tr. vol. 3, May 18, 2009 and June 17, 2009; Lodgment No. 3, Rep.'s Tr. vol. 19, May 19, 2009; <u>id.</u> vol. 20, June 5, 2009; <u>id.</u> vol. 21, Aug. 13, 2009; <u>id.</u> vol. 22, Oct. 7, 2009; <u>id.</u> vol. 23, Jan. 8, 2010; <u>id.</u> vol. 24, May 7, 2010.) In addition, Jernigan wrote two letters to Judge Exharos. In the

first letter, dated May 24, 2010, Jernigan explained, in very lucid and complex terms, that he needed a "critical piece of discovery" in the form of a hearing transcript. (Lodgment No. 1, Clerk's Tr. vol. 7, 1483-85.) He also told the judge that at the hearing in question, Deputy District Attorney Andrea Freshwater had testified about contamination problems in the DNA testing Connie Milton performed. Jernigan sent a second letter to the judge on June 3, 2010. In that letter, he again addressed the contamination in Milton's DNA testing and its relevance to his case. (Id. at 1486.) Petitioner attached to that letter his own lengthy and coherent analysis of the problems with the DNA evidence in his case and what he believed to be misconduct by Freshwater. He attached exhibits which included additional analysis that reflected a thorough and complex understanding of the proceedings, the issues in his case and the charges against him. (Id. at 1487-1523.)

Moreover, at the hearing on Jernigan's Faretta motion, Petitioner told the court he wished to cooperate with his attorney by acting as co-counsel. (Lodgment No. 4, Rep.'s Tr. vol. 1, 19, July 8, 2010.) When that request was denied, Jernigan told the court he wanted to discuss the matter with counsel "at length." (Id. at 19.) In an abundance of caution, and in order to properly decide the Faretta issue, the court ordered Jernigan to undergo a psychiatric evaluation. (Id. at 12-13.) On July 16, 2010, a hearing was held regarding a motion to challenge the jury venire and to discuss the results of the psychiatric evaluation. (Lodgment No. 3, Rep.'s Tr. vol. 26, 4575-80.) Dr. Carol, who evaluated Petitioner, concluded that while Jernigan was "difficult" and "not particularly cooperative," his "eye contact was good, speech was normal, he got along fine . . . [h]e just didn't want to talk about the case." (Id. 4578-80.)

There is ample factual support in the record for the decision by the trial court to deny the request for a competency hearing, and the state appellate court's opinion upholding that decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. See 28 U.S.C.A. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts. See id.(d)(2). Jernigan is not entitled to habeas relief on the basis of this claim.

## 8. **Jury Instruction Error**

In what Petitioner describes as section nine, ground five, Jernigan contends the trial court improperly modified CALCRIM No. 521, which defined the crime of second degree murder. (ECF No. 1, Attach. #8, 136; Lodgment No. 5, Appellant's Opening Brief at 114-18, People v. Jernigan, No. D060746.) The prosecution in Jernigan's case had two theories of guilt: first degree, premeditated, willful and deliberate murder and felony murder. (Lodgment No. 3, Rep.'s Tr. vol. 46, 11046.) Petitioner argues that by modifying CALCRIM No. 521, the court left out an original portion of CALCRIM No. 521 that resulted in the jury being presented with only two options, first degree murder or acquittal. (Id.) Respondent does not address this claim in the Answer.

Jernigan raised this claim in the petition for review he filed in the California Supreme Court. Because that court denied the petition without a citation to authority, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. See Ylst, 501 U.S. at 805-06. That court wrote:

> Jernigan complains the version of CALCRIM No. 521 given, by not including language that explained "all other murders are of the second degree," somehow misled the jury into believing that, if it chose to acquit Jernigan of first degree murder, it was required to acquit Jernigan of all degrees of murder. We are not persuaded by his claim. First, Jernigan does not assert the version of CALCRIM No. 521 given below inaccurately defined the elements for first degree murder or (through its incorporation by reference of CALCRIM No. 520) the elements of second degree murder, or that it inaccurately explained the circumstances under which the jury was required to acquit him of first degree murder. Instead, his claim is that some additional clarification was required in the event the jury concluded the prosecution did not meet its burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser murder. The omission of which Jernigan complains, that the jury was not instructed (in the language used in the 2009-2010 version of CALCRIM No. 521) that "[a]ll other murders are of the second degree," appears to have been based on statutory language defining various crimes that fall within first degree murder (such as felony murder) and states: "All other murders are of the second degree." (Italics added.) Because we conclude the jury was amply instructed on both types of murder, and

the elements for each, the trial court had no sua sponte duty to add language (i.e., "all other murders are of the second degree") that was surplusage, argumentative, duplicative, or potentially confusing. (People v. Moon (2005) 37 Cal.4th 1, 30–32.) However, Jernigan forfeited the alleged error by not objecting to the instruction or requesting a modification or amplification. (People v. Lee (2011) 51 Cal.4th 620, 638 [when instruction accurately states controlling legal principles, a defendant who believes the instruction requires elaboration or clarification is obliged to request such clarification in the trial court and failure to object and request clarification forfeits any claim of error].)

Moreover, we are convinced the instructions, read as a whole, demonstrates there was no instructional error. The trial court gave CALCRIM No. 520 on first or second degree murder with malice aforethought, which set forth the elements of murder and express and implied malice, and stated: "If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree." (See People v. Johnigan (2011) 196 Cal.App.4th 1084, 1092 [CALCRIM No. 520 is an accurate and complete statement of the law].) CALCRIM No. 521 then followed and instructed that to convict for first degree murder, the prosecution had to prove Jernigan acted willfully, deliberately, and with premeditation. The jury was instructed: "The requirements for second degree murder based on express or implied malice, are explained in CALCRIM No. 520. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder." The jury was later instructed that it was given "verdict forms for guilty and not guilty of first degree murder and second degree murder" and instructed that, if the jury unanimously agreed Jernigan "is not guilty of first degree murder but also agree [he] is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and the form for guilty of second degree murder." (Italics added.) We presume jurors are intelligent persons capable of understanding and correlating the instructions given them (People v. Richardson (2008) 43 Cal.4th 959, 1028), who understood the instructions as a whole (People v. Castaneda (2011) 51 Cal.4th 1292, 1320–1321), and followed the instructions. (People v. Delgado (1993) 5 Cal.4th 312, 331.) We conclude there was no instructional error.

(Lodgment No. 7, People v. Jernigan, D060746, slip op. at 48-50.)

Instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (citations omitted); see also Henderson v. Kibbe, 431 U.S. 145, 154 (1977). The allegedly erroneous jury instruction cannot be judged in isolation, however. Estelle, 502 U.S. at 72. Rather, it must be considered in the context of the entire trial record and the instructions as a whole. Id. (citing Cupp. v. Naughten, 414 U.S. 141, 147 (1973)).

In California, murder is defined as "the unlawful killing of a human being, or a fetus, with malice aforethought." Cal. Penal Code § 187(a) (West 2014). Malice can be express or implied. Cal. Penal Code § 188 (West 2014). There are two degrees of murder in California, first and second degree, which are defined, in pertinent part as follows:

> All murder which is perpetrated by . . . any . . . kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate . . . burglary, . . . is murder of the first degree. All other kinds of murders are of the second degree.
>
> . . . .
>
> To prove the killing was "deliberate and premeditated," it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act.

Cal. Penal Code § 189 (West 2014).

The jury in Jernigan's case was first given CALCRIM No. 520, entitled "First and Second Degree Murder With Malice Aforethought (Pen. Code 187)." (Lodgment No. 1, Clerk's Tr. vol. 9, 2040.) The instruction told the jury Jernigan was charged with murder, and that the prosecution had to prove: "1. The defendant committed an act that caused the death of another person; AND 2. When the defendant acted, he had a state of mind called malice aforethought." (Id.) The instruction explained that malice could be express or implied and defined each term. (Id.) It continues: "If you [the jury] decide that the defendant committed murder, you must then decide whether it is murder of the first or

second degree." (Id.)  The jury was next instructed with CALCRIM No. 521, entitled "First Degree Murder (Pen. Code § 189)," which told the jury Jernigan was being prosecuted under two theories of first degree murder.  (Id. at 2041.)  One, the murder was "willful, deliberate, and premeditated," or two, "the defendant killed another person while committing or attempting to commit burglary."  (Id.)  The instruction explained willful, deliberate and premeditated murder, and it described the second theory, felony murder, and that it was explained in CALCRIM No. 540A.  (Id.)  The instruction included that "[t]he requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, ***First or Second Degree Murder With Malice Aforethought.***"  (Id.)  Finally, CALCRIM No. 521 concludes, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."  (Id.)

While CALCRIM No. 521 did not explicitly repeat California Penal Code section 189's statement that all murders other than first degree murder are second degree murder, the jury instructions as a whole accurately explained the law and the elements of each crime to the jury.  The jury instructions were correct, and jurors are presumed to follow the instructions they are given.  See Pena-Rodriguez v. Colorado, __ U.S. __, __, 137 S. Ct. 855, 868 (2017) (citing Penry v. Johnson, 532 U.S. 782, 799 (2001)).  Considering the instructions as a whole, as this Court is required to do, the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  See 28 U.S.C.A. § 2254(d)(1).  Nor was it based on an unreasonable determination of the facts.  See id.(d)(2).  Petitioner is not entitled to habeas relief on the basis of this claim.

### 9.  **Perjury and Obstruction of Justice**

Jernigan argues in section one, ground eight, that the San Diego County Sheriff's records clerk, Tami Walters, and criminalist Milton committed perjury when they declared under penalty of perjury that the records they were providing in response to a

subpoena were accurate.  (ECF No. 1, Attach. #2, 8-22.)  He alleges this was obstruction of justice.  (Id.)  Once again, the Respondent does not address this claim.

The document custodian, Tami Walters, signed a declaration stating that the documents produced were accurate representations of the information contained in the records.  (See Lodgment No. 14, Jernigan v. State of California, [No. 227932] (petition for writ of habeas corpus) [ECF No. 22, Attach. #23, 231].)  Her declaration includes the following statement:  "I declare under penalty of perjury the foregoing is true and accurate."  (See id.)  The declaration also includes a hand-written notation:  "all notes & reports included – [signed] Connie Milton 7-30-07."  (Id.)  Because Petitioner questions the accuracy of Milton's notes, he charges that Walton's and Milton's signatures equate to "perjury and obstruction of justice."  (See id.)

Petitioner raised this claim in the habeas corpus petition he filed in the California Supreme Court, which denied the petition without citation of authority.  (Lodgment No. 14, Jernigan v. State of California, [No. 227932] (petition for writ of habeas corpus) [ECF No. 22, Attach. #23, 223-36]); Lodgment No. 15, [In re Jernigan], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).)  This Court must therefore look to the last reasoned state court decision addressing the claim as the basis for analysis.  See Ylst, 501 U.S. at 805-06.  But neither the California Court of Appeal nor the San Diego Superior Court addressed the claim.  (See Lodgment No. 13, In re Jernigan, No. D067991, slip op. at 1-2; Lodgment No. 11, In re Jernigan, No. EHC 1031, order at 1-15.)  Accordingly, this Court must conduct an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

To present a cognizable federal habeas corpus claim under § 2254, Jernigan must allege both that he is in custody pursuant to a "judgment of a State court" and that he is in

custody in "violation of the Constitution or laws or treaties of the United States." See 28 U.S.C.A. § 2254(a). First, Milton's and Walters's affirmation may have been careless, but Jernigan has not provided evidence of perjury. See Bronston v. United States, 409 U.S. 352, 357-58 (1973) ("The words of the [general federal perjury provision] confine the offense to the witness who 'willfully . . . states . . . any material matter which he does not believe to be true.") Milton testified at the hearing on the motion to dismiss for a speedy trial violation that she had inadvertently failed to include certain records in the response to the subpoena. (Supp. Lodgment No. 1, Rep.'s Tr. Mot. Proceedings 173.) Next, obstruction of justice can occur when a person "'corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding.'" United States v. Surtain, 519 Fed. App'x 266, 275 (5th Cir. 2013) (quoting 18 U.S.C.A. § 1512(c)(1) (West 2008).) There is no evidence that either Milton or Walters corruptly concealed records or documents with the specific intent to impair their availability for use in Jernigan's trial.

Even if this shortcoming is overlooked, the records referred to by Jernigan were available at his trial. Petitioner's claim concerns records and data about interrupted test runs and missing data from well B-3 which occurred during Milton's December 20, 2005 DNA testing. (ECF No. 1, Attach. #2 at 58-62.) At the pretrial hearing on Jernigan's motion to dismiss for a speedy trial violation, Milton was questioned about the "log files" and "run folders" created by the computer on which the DNA analysis is completed. (Supp. Lodgment No. 1, Rep.'s Tr. Mot. Proceedings 36.) According to Milton, the "log files" show "what the instrument is doing," and a "run folder" is "created on the computer where DNA analysis is done, and it contains the sample files, that are generated during the analysis run." (Id. at 36-37.) Under questioning by defense counsel, Milton could not explain why documents and data she had turned over in response to the subpoena did not contain a run folder for a second run of testing completed on December 20, 2005, at 4:52 p.m. (Id. at 49-50.) On the second day of the hearing, under

questioning from the prosecutor, Milton explained she had discovered that she had inadvertently failed to include the run folder from the second December 20, 2005, testing run when responding to the subpoena.  (Id. at 173.)  At that point, the prosecution gave defense counsel a CD containing two run folders from Milton's December 20, 2005 testing.  (Id. at 174.)  Jernigan has attached the run folders from that CD to his petition. (ECF No. 1, Attach. #2, 44-45 (run folder from Dec. 20, 2005, 4:52 p.m. test); id. at 58-60 (run folder from Dec. 20, 2005, 7:20 p.m. test).)  Thus, there was no Brady violation either.  See Strickler, 527 U.S. at 281-82.

At most, what appears to have occurred is a pretrial discovery violation that was corrected prior to trial.  Following an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court," Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853, the Court concludes Jernigan's perjury and obstruction of justice claims are meritless.

### 10. **Criminal Conspiracy**

In section five, ground four, Petitioner alleges D.A. Investigator Howard, and San Diego Deputy District Attorneys Andrea Freshwater and Jill Schall conspired to convict him through the suppression of exculpatory evidence, namely the bloody root hairs, fibers, and trace evidence from June George's bedspread that were stored at the Riverside Department of Justice.  (ECF No. 1, Attach. #6, 109-35.)  The essence of this claim is a Brady violation.  (See id. at 117, 120, 122, 125, 131-33.)

Jernigan raised this claim in the habeas corpus petition he filed with the state supreme Court.  (Lodgment No. 14, Jernigan v. State of California, [No. 227932] (petition for writ of habeas corpus [ECF No. 22, Attach. #28, 39-60]).)  The claim was summarily denied.  (See Lodgment No. 15, [In re Jernigan], California Courts, Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).) The state appellate court did not address this claim, (see Lodgment No. 13, In re Jernigan,

15cv2793 BTM (RBB)

D067991, slip op. at 1-2), but the San Diego Superior Court stated, "Even assuming such a 'criminal conspiracy' has been adequately alleged, petitioner does not cite any authority for this as a ground for habeas relief." (Lodgment No. 11, In re Jernigan, EHC 1031, order at 9.) Similarly, here, Jernigan has not alleged his constitutional rights were violated and therefore he has not stated a cognizable constitutional claim pursuant to 28 U.S.C. § 2254.

Moreover, as discussed in section IV(A)(2)(a) of this Report and Recommendation, this Court has already determined that the prosecution did not commit a Brady violation with regard to the bloody root hairs, fibers, and trace evidence Jernigan refers to because defense counsel was aware of the items and it is speculation that DNA testing of those items would have led to exculpatory evidence. This Court has also concluded counsel was not ineffective for failing to test the bloody root hairs, fibers, and trace evidence. There is no evidence of a conspiracy amongst law enforcement officials to frame Jernigan for June George's murder. Absent evidence of a conspiracy and an adverse effect on Jernigan's trial, Petitioner is not entitled to relief as to this claim. (See Hupp v. San Diego County, Case No. 12cv0492-GPC-RBB, 2014 U.S. Dist. LEXIS 99825, at *14-17 (S.D. Cal. July 21, 2014) (granting defendants summary judgment on plaintiff's alleged Brady violation and conspiracy to commit Brady violation claims).

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Williams, 529 U.S. at 412-13. Nor was it based on an unreasonable determination of the facts. 28 U.S.C.A. § 2254.

**11. Ineffective Assistance of Appellate Counsel**

In what Jernigan describes as section seven, ground six, Petitioner contends appellate counsel was ineffective when he failed to raise three claims on appeal: a prosecutorial misconduct claim alleging the prosecutor improperly vouched for the credibility of her witnesses during closing argument, an ineffective assistance of trial counsel claim for failing to object to the prosecutor's closing argument, and an ineffective assistance of trial counsel claim for failing to discover that Merritt had

committed perjury by testifying he did not have Jernigan's blood sample in 1986.  (ECF No. 1, Attach. #7, 33, 76-78.)  Respondent does not address this claim in the Answer.

Jernigan raised this ground for relief solely in the habeas corpus petition he filed in the California Supreme Court, which summarily denied the petition.  (Lodgment No. 14, Jernigan v. State of California, No. S227932 (petition for writ of habeas corpus [ECF No. 22, Attach. #29, 55-62]); Lodgment No. 15, California Appellate Court, Case Information, http://appellatecases.courtinfo.ca.gov/ (visited Dec. 28, 2015).)  There is no last reasoned state court decision addressing this claim for this Court to "look through" to.  See Ylst, 501 U.S. at 805-06.  Thus, this Court independently reviews the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

The Strickland test applies to ineffective assistance of appellate counsel claims. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Smith v. Murray, 477 U.S. 527, 535-36 (1986)).  A petitioner must first show that his appellate counsel's performance "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  He must then establish he was prejudiced by counsel's errors.  See id. at 694.  To establish prejudice, a petitioner must demonstrate a reasonable probability that he would have prevailed on appeal absent counsel's errors.  Smith, 528 U.S. at 285 (citing Strickland, 466 U.S. at 694).  Moreover, appellate counsel is not required to raise frivolous or meritless claims on appeal.  See Jones v. Ryan, 691 F.3d 1093, 1101 (9th Cir. 2012).  The Ninth Circuit has noted:

> [Strickland's] two prongs partially overlap when evaluating the performance of appellate counsel.  In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.

///

1  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (footnote omitted)
2  (citations omitted).

3  "Vouching consists of placing the prestige of the government behind a witness
4  through personal assurances of the witness's veracity, or suggesting that information not
5  presented to the jury supports the witness's testimony." United States v. Necoechea, 986
6  F.2d 1273, 1276 (9th Cir. 1993) (citations omitted).  Jernigan points to the following
7  statement made by the prosecutor during closing argument:

8      [MS. SCHALL:]  That there's this vast conspiracy, in making
9      reference to the defendant being black, that's so out of line.  Or the
       stringing up reference, that is so out of line.  Because the fact of the matter
10     is, you're not going to have Connie Milton, Vince Brown, Myself,
       Investigator Howard, ever participate in a conspiracy.  There is nothing to
11     be gained by the wrong man being held accountable.  There is nothing to
12     be gained by June George's murderer getting away.

13

14  (Lodgment No. 3, Rep.'s Tr. vol. 46, 11109.)

15      The prosecutor's comments may have amounted to vouching because they
16  suggested the prosecutor and prosecution witnesses were not capable of lying and
17  entering into a conspiracy to convict Jernigan.  Petitioner has not established appellate
18  counsel was ineffective, however, because he has not established he was prejudiced by
19  counsel's failure to raise either a prosecutorial vouching claim or an ineffective assistance
20  of trial counsel claim for failing to object to the prosecutor's comment.  See Smith, 528
21  U.S. at 285.  As discussed in section IV(A)(2)(b) of this Report and Recommendation, in
22  order to establish prosecutorial misconduct, a petitioner must demonstrate that a
23  prosecutor's remarks "'so infected the trial with unfairness as to make the resulting
24  conviction a denial of due process.'"  Darden, 477 U.S. at 181 (quoting Donnelly, 416
25  U.S. at 643).  Given the strength of the DNA evidence against Jernigan, defense
26  counsel's extensive cross-examination of the prosecution's witnesses, the absence of any
27  evidence that law enforcement engaged in a conspiracy to convict Jernigan, even if
28  appellate counsel had raised a claim of prosecutorial vouching, there is no reasonable

probability that Petitioner would have prevailed on appeal absent counsel's errors. <u>See</u> <u>Smith</u>, 528 U.S. at 285. For the same reasons, there is no reasonable probability appellate counsel would have prevailed on a claim that trial counsel was ineffective for failing to object to the prosecutor's argument. <u>See</u> <u>id.</u>

Jernigan contends that appellate counsel should have raised a claim regarding Burke's alleged perjury concerning his possession of Petitioner's blood sample. But counsel's failure to do so was a reasonable, strategic decision because, as discussed in sections IV(A)(1)(b) and IV(A)(2)(b), the claim was meritless. In addition, Jernigan has not established that he was prejudiced by appellate counsel's decision not to raise this claim because he has not shown a reasonable probability the result of the proceeding would have been different had counsel done so. <u>See</u> <u>id.</u> Any impeachment of Merritt on his blood type testing would not have called into doubt the subsequent incriminating DNA findings by Milton, Rogala, Spurgeon and Sonnenberg.

The state court's denial of this claim was objectively reasonable. Furthermore, it was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. <u>See</u> 28 U.S.C.A. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts. <u>See</u> <u>id.</u>(d)(2). This claim does not entitle Jernigan to relief.

## 12. **Cumulative Error**

In section nine, ground six, Petitioner alleges the cumulative effect of all the errors in his case rendered his trial fundamentally unfair, in violation of his federal constitutional due process rights. (ECF No. 1, Attach. #8, 136; Lodgment No. 5, Appellant's Opening Brief at 128, <u>People v. Jernigan</u>, No. D060746.) Jernigan raised this claim in the petition for review he filed in the California Supreme Court on direct appeal, which denied the petition without a citation of authority. (Lodgment No. 8, Petition for Review at ii, <u>People v. Jernigan</u>, No. [S215964]; Lodgment No. 9, <u>People v. Jernigan</u>, No. S215964, order at 1.) Jernigan's federal constitutional error claim is premised on the arguments contained in the petition for review. (ECF No. 1, Attach. #8, 135-37.) Consequently, the state appellate court's opinion would be the basis for analysis of this

claim. See Ylst, 501 U.S. at 805-06. The state appellate court did not address this claim, (Lodgment No. 7, People v. Jernigan, No. D060746, slip op), and so this Court must conduct an independent review of the record to "determine what arguments or theories . . . could have supported, the state court's decision . . . and . . . whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102; see also Himes, 336 F.3d at 853.

The Ninth Circuit has stated that "The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers, 410 U.S. at 298, 302-03); see also Whelchel v. Washington, 232 F.3d 1197, 1212 (9th Cir. 2000). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle, 505 F.3d at 927 (citing Chambers, 410 U.S. at 290 n.3); see also United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (stating that where no single trial error in isolation is sufficiently prejudicial, "the cumulative effect of multiple errors may still prejudice a defendant[]" (citing United States v. Green, 648 F.2d 587 (9th Cir. 1981))). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." Frederick, 78 F.3d at 1381 (quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988)). Cumulative error warrants habeas relief only "where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" Parle, 505 F.3d at 927 (citation omitted) (quoting Brecht, 507 U.S. at 637).

This Court has found that none of the claims Jernigan has presented amounted to constitutional error. Because no errors occurred, no cumulative error is possible. See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011). Accordingly, the state court's denial

of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and Petitioner is not entitled to relief for his cumulative error claim.  See 28 U.S.C.A. § 2254(d)(1).

**B.  <u>Evidentiary Hearing</u>**

Jernigan asks for an evidentiary hearing in his case.  (Mot. for Evidentiary Hr'g 1-5, ECF No. 28.)   Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --

> (A) the claim relies on --

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

In deciding whether to grant an evidentiary hearing, the court must first "'determine whether a factual basis exists in the record to support the petitioner's claim.'"  <u>Insyxiengmay v. Morgan</u>, 403 F.3d 657, 669 (9th Cir. 2005) (quoting <u>Baja</u>, 187 F.3d at 1078).  If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of a claim in State court.'"  <u>Id.</u> at 670 (quoting <u>Baja</u>, 187 F.3d at

1078.)  A failure to develop the factual basis of a claim in state court implies some "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  See Williams, 529 U.S. at 432.  The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."  Id. at 437.

Pursuant to Cullen v. Pinholster, 563 U.S. 170 (2011), Jernigan is limited to the facts presented to the state court.  In Pinholster, the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court.  563 U.S. at 181-82. Petitioner can only proceed to develop additional evidence in federal court if either § 2254(d)(1) or (d)(2) are first satisfied.  See Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief[]" (citing Pinholster, 563 U.S. at 203 n.20)).  For all the reasons discussed above, Petitioner is not entitled to federal habeas relief.  Accordingly, Jernigan's request for an evidentiary hearing is **DENIED**.

### C.  **Motion for Discovery**

Petitioner has filed a motion for additional discovery.  (Mot. Addt'l Disc., ECF No. 30.)  "[There] is no federal right, constitutional or otherwise, to discovery in habeas proceedings as a general matter."  Campbell v. Blodgett, 982 F.2d 1356, 1358 (9th Cir. 1993) (citing Harris v. Nelson, 394 U.S. 286, 296 (1989)).  Discovery in federal habeas corpus proceedings is governed by Rule 6 of the Rules Following 28 U.S.C. § 2254, which requires a petitioner to show good cause for the request.  Rule 6(a), 28 U.S.C.A. foll. § 2254 (West 2006).  Good cause is shown when a petition provides "'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (citation omitted).  Nevertheless, "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere

/ / /

speculation." <u>Calderon v. U.S. Dist. Ct. for the N. D. Cal.</u>, 98 F.3d 1102, 1106 (9th Cir. 1996) (citations omitted).

Jernigan requests the following discovery: (1) Chuck Merritt's prior San Diego County Sheriff's laboratory service reports and case notes, (2) any corrective actions undertaken by the Sheriff's laboratory, and (3) any statements made by Merritt under oath regarding his scientific findings. (Mot. Addt'l Disc. 7-8, ECF No. 30.) Petitioner claims the discovery he seeks is necessary to "accurately determine the 'full' extent of Criminalist Merritt's wrongdoings and misdeeds that occurred during this entire tenure while working at the crime laboratory," and that it is "more 'likely' than not that a review of additional discovery involving Criminalist Merritt will reveal more of the same wrongdoings." (<u>Id.</u> at 1, 4.)

Jernigan's speculative rationale lacks the specificity that would warrant discovery. Rather, Petitioner seeks documents that he wishes to review in order to find evidence of misdeeds by Merritt. That is, quite simply, a "fishing expedition[] to investigate mere speculation." <u>Calderon</u>, 98 F.3d at 1106. In any event, as discussed above in section IV(B), this Court is limited to the evidence presented in state court unless Jernigan has satisfied 28 U.S.C. § 2254(d). <u>Pinholster</u>, 563 U.S. at 181-82; <u>Sully</u>, 725 F.3d at 1075. As this Court has concluded that he has not done so, discovery is **DENIED**.

# V.    CONCLUSION

The Court submits this Report and Recommendation to Chief United States District Judge Barry Ted Moskowitz under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY RECOMMENDED** that the Court issue an order (1) approving and adopting this Report and Recommendation, and (2) entering judgment **DENYING** the Petition for Writ of Habeas Corpus [ECF No. 1]. In addition, **IT IS HEREBY ORDERED** that Petitioner's motions for an evidentiary hearing and for discovery are **DENIED** [ECF Nos. 28, 30].

/ / /

**IT IS ORDERED** that no later than **December 22, 2017**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **January 19, 2018**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: November 7, 2017

Hon. Ruben B. Brooks
United States Magistrate Judge